Third degree burglary<br>(Judge Fitzgerald)

Offense: March 10, 1993

Conviction: October 4, 1993

Sentence: October 25, 1993
  (suspended imposition of sentence)

Sentence: December 13, 1994 (p.m.)
  (2 years consecutive to
   sentence imposed earlier in
   day on robbery)

[¶ 13] Under SDCL 22–6–6.1, Judge Tice had the authority to give Arguello a concurrent or a consecutive sentence because he was sentencing for a subsequent conviction and a subsequent offense. In this case, however, Judge Fitzgerald did not have the authority to give a consecutive sentence since he was sentencing on a prior, not a subsequent, offense.

[¶ 14] We reverse and remand for resentencing in accordance with this opinion.

[¶ 15] MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., participating.

2A Sutherland *Statutory Construction* § 46.05 (5th Ed); *See Luze v. Bruening,* 42 S.D. 414, 176 N.W. 41 (1920); State v. Mudie, 22 S.D. 41, 115 N.W. 107 (1908).

[¶ 12] In Arguello's case, the time lines for the offenses, convictions[2], and sentencing are:

First degree robbery<br>(Judge Tice)

April 13, 1994

November 30, 1994

December 13, 1994 (a.m.)
  (15 years; no mention of
   whether concurrent or
   consecutive)

1996 SD 60

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Donald Eugene MOELLER, Defendant and Appellant.**

**No. 18108.**

Supreme Court of South Dakota.

Argued April 24, 1995.

Decided May 22, 1996.

---

Mark W. Barnett, Atty. Gen., Craig M. Eichstadt, Sherri Sundem Wald, Gary Campbell, Asst. Attys. Gen., Pierre, for plaintiff and appellee.

Michael J. Butler of Butler and Nesson, Sioux Falls, and David R. Gienapp of Arneson, Issenhuth, Gienapp & Blair, Madison, for defendant and appellant.

MILLER, Chief Justice.

[¶ 1] In this appeal, Donald Moeller challenges his conviction of first-degree rape and first-degree murder. He was sentenced to

twenty-five years in prison on the rape charge. He received a sentence of death by lethal injection for the murder conviction.[1]

[¶ 2] This appeal involves, among other issues, a challenge to South Dakota's death penalty which was reenacted in 1979. As set forth in detail later herein, we uphold the constitutionality of this state's death penalty statutes. We reverse the convictions and remand, because prior bad acts evidence was improperly received into evidence and prevented Moeller from receiving a fair trial.

## FACTS

[¶ 3] Rebecca O'Connell (Becky) was a nine-year-old girl who lived with her mother and stepfather in Sioux Falls, South Dakota. Becky was last seen by her parents on the evening of May 8, 1990, when she left their home to buy candy at a nearby convenience store. Later that night, Becky's mother and stepfather reported to the police that she was missing. The following morning, two men found her body in a wooded area in Lincoln County, South Dakota. An autopsy suggested she had been raped, vaginally and anally, and had sustained knife wounds to her neck, shoulder, chest, back, hip, and hands. A forensic pathologist opined that she died as a result of a cut to the jugular vein of her neck.

[¶ 4] Following an investigation of Becky's death, the State charged Donald Moeller with rape in the first degree, felony murder in the first degree, and premeditated murder in the first degree. The jury convicted Moeller on all three counts. As to the murder convictions, the jury recommended a sentence of death and the trial court entered a warrant of execution. Additional facts will be recited herein as they relate to specific issues.

## ISSUE 1.

[¶ 5] **Did the trial court abuse its discretion in admitting "prior bad acts" evidence involving three sexual assaults allegedly committed by Moeller in 1973, 1979, and 1990?**

[¶ 6] In this country it is a settled and fundamental principle that persons charged

with crimes must be tried for what they allegedly did, not for who they are. *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir.1985). The Ninth Circuit Court of Appeals has observed:

> Under our system, an individual may be convicted only for the offense of which he is charged and not for other unrelated criminal acts which he may have committed. Therefore, the guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that defendant has engaged in other acts of wrongdoing.

*Id.* No matter how vile or despicable a person may appear to be, he or she is entitled to a fair trial. Constitutional provisions clearly provide that individuals may only be convicted for the crimes with which they are charged; they may not be subject to criminal conviction merely because they have a detestable or abhorrent background. *Id.* Our entire system of justice would deteriorate if we did not jealously protect these constitutional safeguards for all citizens.

## [¶ 7] A. Facts

[¶ 8] The State filed a motion to introduce prior bad acts testimony from three individuals who claimed that Moeller attempted to sexually assault them while threatening them with a knife. Their testimony is summarized as follows.

**1973 Incident.** Testimony of Carolyn Beshaw: In January 1973, when Carolyn Beshaw was twenty-one years old, she worked at the Speedy Car Wash in Sioux Falls, South Dakota. On the morning of January 3, 1973, Beshaw was on her way to work. She had stopped her car at the stoplight near Axtell Park in Sioux Falls. Beshaw heard a women yell, "Get out, get out of my car." She heard a door slam. Then a man, whom she later identified as Donald Moeller, was pushing on the door handle on the passenger side of her car. Moeller was a stranger to her. He opened the door and slid into her car. He was holding a black-handled folding knife with a three-inch blade.

---

1. Moeller is currently serving a life sentence without possibility of parole for crimes that are unrelated to this case. *See State v. Moeller*, 511 N.W.2d 803 (S.D.1994).

Moeller poked Beshaw's leg with the knife and said, "Go down East Eighth and go straight and keep going." Beshaw complied. Beshaw's car stalled and she and Moeller got out of the car. As he held the knife by her ribs, Beshaw lifted the hood and checked the carburetor. Then she and Moeller got back into the car on the passenger's side. Moeller told her to continue driving straight, which she did. When they came upon a cornfield, he held the knife at her hip and told her to take her pants off. She turned the car off and threw the keys out the window. When she refused to remove her clothes, Moeller said, "If you don't, I'll kill you." Beshaw replied, "You will have to kill me, because I won't do it." When she tried to slip out of the car, he grabbed her, held the knife to her neck, and said, "Do it or I'll kill you." She responded, "You'll have to kill me because I ain't going to do it for you or anybody else." Shaking, Moeller just sat and stared. He folded the knife and put it in his pocket. He proceeded to tell Beshaw about his life. She retrieved her keys and told Moeller to get out of her car. Moeller told her to get in the car and pointed at the knife in his pocket. He told her to drive to work, so she drove to the Speedy Car Wash. He instructed her to tell her boss she had had a flat tire. He warned Beshaw that she could look over her shoulder and see him or he could be in the back seat of her car. He walked up the road, saying he was headed to a friend's house. Beshaw told her boss she had had a flat tire. Then, forty-five minutes later, she told him about the man with the knife.

**1979 Incident.** Testimony of Kenneth Moore: In 1979, Moeller lived next door to Kenneth Moore, then age thirteen, in a trailer park in Wright, Wyoming. Moore had waved at Moeller a few times on his way to school. On February 10, 1979, Moore noticed Moeller outside working on his car. Moore was interested in car mechanics, and he and Moeller struck up a conversation. Moeller invited Moore into his trailer, where they talked and played cards. Moore's father gave him permission to eat dinner at Moeller's home. Moore noticed a black buck knife lying on the table in Moeller's kitchen. When Moore began to open the knife, Moeller told him not to play with it because it was very sharp. He demonstrated by slicing through paper with the knife. After dinner, Moeller gave Moore two glasses of wine. Then Moeller made a $100 bet that Moore could not drink five glasses of wine in two minutes. Moore did, but Moeller did not pay him the money. Moeller then offered to take him to Gillette, Wyoming, where he could help Moeller repair a car. Moeller insisted that Moore receive written permission from his father. Moore's father came to Moeller's trailer with a note, giving his son permission to take the trip. Moore's father returned to his trailer. Moore and Moeller resumed playing cards. When Moore complained of the heat in the trailer, Moeller let him use his robe. Moore removed all his clothes, except for his underwear, and put on the robe. Moeller instructed Moore to place a jar of Vaseline on the nightstand in Moeller's bedroom, stating he would explain the need for the Vaseline later. Then Moeller asked Moore if he had ever ejaculated, and Moore replied that he had not. Moeller offered to bet Moore $50 that he could not ejaculate. Moore refused the bet. Moeller then bet him $50 that he could not escape if Moeller tied his hands behind his back. Moeller tied Moore's hands behind his back and placed a dog chain around his neck, while Moore knelt on the bed. Once Moore was tied, Moeller said, "I want to have sex with you." Moore refused and Moeller stuck the buck knife to Moore's throat and said, "You either have a choice, you can do oral sex with me or let me make —— have sex with you through your rear end or I'll kill you." Moore asked Moeller to remove the dog chain so he could breathe. Moeller laid his knife down and removed the dog chain from Moore's neck. Moore then jumped off the bed and ran for the front door. Moeller grabbed the knife and made a cut two inches long and a quarter inch deep in Moore's leg. As Moore struggled to open the door, Moeller approached with the knife. Moore slammed against the door and fell into the snow. Moeller grabbed Moore's waist and legs, but Moore escaped into his trailer. Moore told his father, "That son-of-a-bitch tried to kill me."

**1990 Incident.** Testimony of Tracy Warner: In November or December of 1989, Tracy Warner met Moeller when he gave an acquaintance of hers a ride to Warner's home. She did not see Moeller again until January 20, 1990. At around 10:00 p.m. on that date, Warner heard a knock at her door. After yelling, "Come in," she turned to see Moeller inside her door. She remembered Moeller's face but could not remember his name. Moeller sat down and asked if Warner liked to go out, drink or dance. She replied, "No." Moeller asked if he could come back another time, and she told him he could, as long as he only wanted to watch television. At around 11:00 p.m. that same night, Warner heard a tap on the door and then someone entered. It was Moeller. He asked if he could watch television with her, and she said it was okay. Moeller had brought a bottle of Jack Daniels whiskey with him and handed a soft drink to Warner. He walked out of the living room towards the kitchen, then returned to the living room with a knife. It was a folding knife, with a three and a half inch blade and a brown handle. Moeller ran the blade up and down Warner's breasts, saying "Lift up your shirt or I'm going to cut you. Show them to me or you're going to get cut." When she told him to stop, he ran the flat side of the blade up and down her arm, saying, "That's the side of the knife, do you want to feel the edge?" Then he ran the knife up and down her breasts again. Warner responded, "If you don't stop—If my baby wakes up because of this shit I'm going to be pissed." Moeller said, "Who do you think is going to get cut first, you or her?" Warner grabbed the knife and was cut as Moeller pulled it away. She told him, "I'm going to call the cops." She nudged past him and went out the back door. On her way out, Moeller said, "I didn't know you were going to get cut." Warner ran to the intersection and flagged down a car. Concerned for her daughter, she returned to the house and saw Moeller driving out of her driveway. Her child slept undisturbed during the incident.

## [¶ 9] B. Discussion

[¶ 10] Prior to trial, Moeller moved to suppress the testimony of Beshaw, Moore, and Warner. After a hearing, the trial court held the testimony admissible in the State's case-in-chief. The court ultimately concluded that the extrinsic evidence, if believed by the jury, was relevant to show common method, plan or scheme, intent, identity, and motive. In justifying the relevance of the other acts evidence, the trial court seemed to identify five common marks between the crimes charged in the indictment and the "prior bad acts": (1) Moeller had some acquaintanceship with or knowledge of all the victims; (2) his object was always to obtain sex; (3) he was willing to threaten reluctant victims with a pocket or buck-style knife; (4) he committed the acts within his own general neighborhood; and (5) his attacks were "mostly opportunistic" as opposed to planned attacks intended to conceal the identity of the perpetrator.[2] The court also concluded that the

---

2. The record does not support the minority opinion's assertion that the trial court identified ten common marks between the crimes charged and the prior bad acts. The list of ten similarities identified in the court's Findings of Fact and Conclusions of Law dealt with similarities among the prior bad acts, not similarities among the prior bad acts and the crimes committed against Becky.

Even if we assume the trial court intended this list as a catalogue of the common factors between the crimes charged and the prior bad acts, many of the ten "common marks" are not present in Becky's case. For instance, one of the ten similarities is "[i]n each instance the victim was able to identify the Defendant." Becky was killed and was unable to name her assailant. Another common mark listed by the trial court is that Moeller threatened to kill his victims. There is no evidence that Becky's assailant warned her that she would be killed or otherwise threatened her with a knife prior to her death. Likewise, the trial court's finding that "in each instance the Defendant committed the act within his own general neighborhood" is not true in Becky's case. The evidence indicated that Becky's rape and murder occurred in a secluded area near Lake Alvin, some fourteen miles from Moeller's home in the city of Sioux Falls.

The trial court's finding that each act involved a folding knife with approximately the same or similar length blade also does not apply in Becky's case. (The trial court essentially restated this finding three times in the list of "ten" similarities). As noted later in this opinion, there was no evidence proving that Becky's assailant used a folding or buck-style knife or that the length of the blade was similar to the length of the knives used to assault the other acts victims.

probative value of the evidence was not substantially outweighed by its prejudicial effect. At trial, before each of the other acts witnesses testified, the court instructed the jury that the testimony could only be used to show common method, plan or scheme, intent, identity and motive. The trial court reiterated this instruction prior to the jury's guilt deliberations.

[¶ 11] Moeller asserts the judge abused his discretion in admitting the testimony of Beshaw, Moore, and Warner. First, he contends the dissimilarities between the prior bad acts and the charged offenses were so great as to defeat the State's claim that the other acts were relevant to prove identity. He notes that the victims were of different ages and gender and the details of the crimes were decidedly different. He also asserts that some of the common marks identified by the trial court were in fact absent. Second, he argues that the 1973 and 1979 incidents were too remote to be relevant to the charged offenses, which occurred in 1990. Finally, he claims the probative value of the evidence was substantially outweighed by the danger of unfairly prejudicing the defendant, confusing the issues, and misleading the jury.

[¶ 12] Generally, evidence of crimes or acts other than the ones with which the defendant is charged are inadmissible, unless certain exceptions apply. SDCL 19–12–5; *State v. Thomas*, 381 N.W.2d 232, 235 (S.D.1986). SDCL 19–12–5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Under the statute, prior bad acts evidence is not admissible to show that, merely because a defendant committed a similar offense on another occasion, he has a propensity to commit the offense charged. SDCL 19–12–5; *State v. Steele*, 510 N.W.2d 661, 668 n. 8 (S.D.1994); John W. Strong, McCormick on Evidence § 190 at 798 (4th ed. 1992); 2 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 404[04] at 404–26 (1992). There are sound policy and constitutional reasons for this rule.

> Introduction of evidence that the defendant committed other crimes and unwholesome acts may lead jurors to return a verdict of guilty for reasons other than finding all the elements of the alleged crime beyond a reasonable doubt. Although reasonable doubt of guilt exists on this occasion, the jury might conclude the defendant is a "bad man," who deserves punishment regardless of his innocence of the crime charged and warrants imprisonment to prevent future maleficent acts. Such results defeat the letter and policy of substantive criminal law mandating conviction based upon a non-vague concrete statute; instead, jurors have found the defendant guilty based upon past unsavory acts without necessarily violating any criminal statute in the process. Alternatively, and just as improperly, upon learning that the accused committed other crimes or wrongs, jurors might infer that the defendant has a propensity to commit crimes and probably committed this crime as charged.

---

Another common factor listed by the trial court is "[i]n each instance the attack was opportunistic as opposed to a planned attack with the intent to conceal the identity of the perpetrator." However, the State specifically argued to the jury that Moeller killed Becky to conceal his identity.

The trial court's finding that "in each instance the Defendant had a passing knowledge or acquaintance of the victim" also fails. One of the other acts victims was a stranger to Moeller and Moeller's knowledge or acquaintanceship with Becky is highly questionable.

In all, eight of the "ten" common marks listed in the court's findings and conclusions are absent in Becky's case. Another entry in the list of

ten similarities, that Moeller had two folding knives in his possession when he was arrested for Becky's murder, does not prove a signature method common to the other acts and the crimes charged. It simply shows that Moeller carried knives similar to those he used in assaulting Beshaw, Warner and Moore. Since the type of knife used to murder Becky was never determined, the critical link between Moeller's history of assaults and Becky's death is missing. The only similarity that remains in this "list of ten" is that the object in each instance was to obtain sex. For reasons discussed later in this opinion, this finding is insufficient to warrant admission of other acts evidence.

*State v. Werner,* 482 N.W.2d 286, 295 (S.D. 1992) (Amundson, J., concurring in part and dissenting in part) (quoting Patterson, Evidence of Prior Bad Acts: Admissibility Under the Federal Rules, 38 Baylor. L.Rev. 331, 332–33 (1986)).

[¶ 13] Under SDCL 19–12–5, the trial court must follow a two-step analysis when ruling on admissibility of other acts evidence:

1. Is the intended purpose for offering the other acts evidence relevant to some material issue in the case (factual relevancy), and

2. Is the probative value of the evidence substantially outweighed by its prejudicial effect (logical relevancy).

*Steele,* 510 N.W.2d at 667. We review the trial court's decision to admit such evidence under the abuse of discretion standard. *State v. Ondricek,* 535 N.W.2d 872, 873 (S.D. 1995) (citing *Steele,* 510 N.W.2d at 667).

[¶ 14] In this case, the trial court ruled that the two-part test was satisfied. The court instructed the jury that the other acts testimony could be used as proof of common method, plan or scheme, intent, identity, and motive. All of these issues were material to the State's circumstantial case.

[¶ 15] Moeller's defense rested on his assertion that he did not rape and murder Becky O'Connell. Therefore, his identity as the assailant was clearly in issue. Furthermore, the identity exception to the extrinsic evidence rule is closely related to other exceptions contained in the rule; showing that a similarity exists in method or motive between the other acts and the charged offense, or that the other acts and the charged offense were part of a larger plan or scheme, tends to identify the defendant as the perpetrator. *McCormick on Evidence, supra,* § 190 at 808; Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 114 at 677–78 (2nd ed 1994). *See also Thomas,* 381 N.W.2d at 236–37. Hence, offering the other acts evidence as proof of motive, a common method, plan or scheme all related to identifying Moeller as the perpetrator. Finally, whether Moeller possessed a murderous intent, *i.e.,* a premeditated design

to kill, was directly relevant to the allegation of premeditated murder leveled against him.

[¶ 16] While the bad acts evidence related to *material* issues in the case, the *probative value* of the evidence was minimal. When seeking to prove identity through a common criminal method, the probative value of prior bad acts evidence is directly related to the factual similarities between the other acts and the charged offenses. The common method or "modus operandi" exception is used where two or more crimes exhibit a similar pattern "that is so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer." *State v. Champagne,* 422 N.W.2d 840, 842–43 (S.D. 1988). The inference is that "[s]ince the defendant acted in a distinctively similar manner on another occasion, it is more likely he (rather than someone else) did the act on the occasion of the charged crime." *Id.* at 843. Here, the similarities between the other acts and the alleged crimes against Becky are so slight and unremarkable, and the dissimilarities are so great, that the probative value of the extrinsic evidence is negligible.

[¶ 17] We begin by noting one of the common marks identified by the trial court is absent. Moeller did not have an acquaintanceship with or knowledge of all the victims. Beshaw testified Moeller was a stranger at the time he allegedly assaulted her, and she did not testify to any prior connection between herself and Moeller. The trial court's finding that Moeller had an acquaintanceship or knowledge of Becky is also highly questionable. The trial court found that shortly before Becky's disappearance, she and Moeller were in a convenience store at approximately the same time. The trial court also found that Moeller and Becky lived within blocks of each other in the same general neighborhood in North Sioux Falls. This meager evidence hardly supports the conclusion that Moeller was acquainted with or knew of Becky.

[¶ 18] The trial court also found that "in each instance the attack was opportunistic, as opposed to a planned attack with the intent to conceal the identity of the perpetrator." Yet, according to State's own closing argu-

ment, this is not so. State argued to the jury that Moeller's motive for killing Becky was to prevent her from identifying him as her assailant. Therefore, under State's theory of the case, the "intent to conceal the identity of the perpetrator" was clearly present. Furthermore, although State described Beshaw's assault and Becky's rape and murder as "opportunistic," State told the jury that Moore's attack "has both characteristics of being opportunistic and planned." State then emphasized Moeller's efforts to con Moore into coming to his home and spending the night. As to the assault on Warner, State noted the lapse of time between Moeller's introduction to Warner and his visit to her home on the night of the assault. The State told the jury, "There was some elements of planning in this."

[¶ 19] The three remaining similarities between the prior bad acts and the charged offense are not so distinctive or unique as to justify admission of prior bad acts evidence. *See id.* The trial court stated that Moeller's object was always to obtain sex. However, any sexual assault crime involves a perpetrator who seeks sexual gratification. Permitting other acts evidence on the basis of this broad similarity invites the jury to draw the forbidden propensity inference. A more specific factual showing is required to allow admission of extrinsic evidence.

[¶ 20] The trial court's observation that Moeller committed the acts within his own general neighborhood does little to distinguish Moeller as the perpetrator, particularly when one considers the broad area apparently defined as his neighborhood. While Moeller lived next door to Moore, the State concedes he lived as far as ten to fifteen blocks from Warner. The trial court found that Moeller and Beshaw lived within the same general neighborhood, but Moeller's assault of Beshaw occurred in downtown Sioux Falls and proceeded to a corn field east of the city. Likewise, while Moeller lived within several blocks of Becky's home, the crime scene was located in a secluded area approximately fourteen miles south of Moeller's home in Sioux Falls.

[¶ 21] Finally, although the instant crimes and the other acts involved a knife as a

weapon, the State failed to prove a more detailed comparison. In seeking admission of the prior bad acts evidence, the State specifically represented to the trial court that the knife wounds on Becky's body were inflicted by the *same type of knife* used against the other acts victims. State's brief to the trial court reads in relevant part:

> The most obvious common element between the crime charged in this Indictment and the other acts is the use of a folding pocket knife, whether denominated a jack knife or buck knife. Moeller used the same type of knife on Carolyn Kaye Mullinix [Beshaw] in 1973, on Kenneth Everett Moore in 1979 and on Tracy Warner in 1990. Moeller was apprehended in Tacoma Washington, with two of the same type of knives in his possession. *The knife wounds on the body of Rebecca O'Connell are also consistent with the use of this type of knife.* (Emphasis supplied).

The State further argued:

> Here, Donald Moeller's past assaults signs his name to the body found at Lake Alvin on May 9, 1990. Moeller invariably uses a folding pocket, or buck, knife to commit his sexual assaults.

In its memorandum decision permitting the admission of the other acts testimony, the trial court made particular note of the State's representation concerning the type of knife used to murder Becky. The court wrote:

> The most distinctive common mark between the crimes charged in the indictment and the other crimes-act evidence sought to be introduced is the use by the defendant of the same type of knife in all three incidents. The assault in 1973, the 1979 assault against a nine year old boy, Kenneth Everett Moore, and the Tracy Warner assault in 1990, all involved a pocket knife or some kind of buck knife.
>
> Furthermore, when defendant was apprehended in Tacoma, Washington, in 1991, he had two of the same type knives in his possession. *The State represents that the knife wounds on the body of Rebecca O'Connell will be shown as consistent with the use of this type of knife.* (Emphasis supplied).

[¶ 22] Significantly, the evidence at trial did not support the State's claim. The knife in each of the other acts cases was a folding knife, described by two witnesses as having a three to three-and-a-half inch blade. In contrast, the knife used in the murder of Becky was never found, and State's witnesses could not identify either the type of knife or the length of blade involved in her death.

[¶ 23] In an effort to draw a comparison between the prior bad acts and the murder of Becky, the minority opinion notes that Moeller had two folding pocket knives in his possession when he was arrested for Becky's murder. However, there is no testimony identifying either of these pocket knives as the murder weapon. In fact, as noted above, there is no proof at all that Becky died from a folding or buck-style knife. Whether such a knife was used against Becky remains unknown. Any assertion by the minority opinion that Becky's assailant used a folding or buck-style knife is pure conjecture.

[¶ 24] Furthermore, the record does not support suggestions by the dissent that the length of the blade used against Becky was similar to the three or three and one-half-inch blade used in the assaults of Beshaw and Warner. The minority opinion points to testimony of a forensic pathologist, Dr. Randall, concerning a four-inch chest wound and an indication that the knife blade had been inserted to the hilt in making the wound. The minority states, "Clearly ... the blade did not exceed four inches in length and could not have been substantially shorter than that." However, this conclusion goes far beyond the evidence in the record. Dr. Randall testified as follows:

Prosecutor Masten: Were you able to estimate roughly the length of the blade that would have caused that wound?

Dr. Randall: No. As I mentioned, the depth of the wound was four inches but a shorter blade could have produced that due to the compression of the chest. *So you really can't make any estimation of the exact length of the blade.* (Emphasis supplied.)

On cross-examination, Dr. Randall again testified that he was unable to establish the length of the blade:

Defense Attorney Gienapp: And from either the slashing wounds or any of the puncture wounds, you can't tell the length of the knife or other sharp object that was utilized, is that correct?

Dr. Randall: That's correct.

Even the State concedes "Dr. Randall was unable to determine the length of the blade used to kill Becky." The contention in the minority opinion that "the blade did not exceed four inches in length and could not have been substantially shorter than that" is simply not supported by a fair and complete review of the record.

[¶ 25] Having failed to establish the type of knife or length of blade used against Becky, the State is left with the generic observation that all the offenses involved the use of a knife. However, the use of a knife as a weapon is not so distinctive or of such an unusual pattern to distinguish Moeller as the assailant from the many other perpetrators who rape and murder by knife. The minority opinion refers to sixteen reported cases of rape, assault, and murder in South Dakota that involved the use of a knife as a weapon. Moeller was not identified as the assailant in any of these cases, even though the minority opinion would have us believe that the use of a knife is Moeller's "signature." Additionally, we can only surmise about the countless rape, murder, and assault cases involving the use of knives that are never tried before a jury, appealed to this Court, and published in a reporter. Focusing on only reported cases is an unrealistic and unscientific means of deciding whether the use of a folding or buck-style knife is a unique characteristic. Importantly, other courts have regarded the use of a knife as insufficient to establish a modus operandi, even when considered together with other identifiers like an accompanying verbal threat. *See United States v. Pisari,* 636 F.2d 855, 859 (1st Cir.1981) (in the absence of a similar or distinctive knife, the single fact that "one invokes the threat of using a knife falls far short of a sufficient signature or trademark upon which to posit an inference of identity"); *People v. Connors,* 82 Ill.App.3d 312, 37 Ill.Dec. 771, 776, 402 N.E.2d 773, 778 (1980) (the general similarities of robbery with a gun at night near the

victim's car coupled with statements like "Don't make me shoot you" and "If you move I'll shoot" are "common to crimes in general, and not so distinctive as to earmark each as the conduct of the same perpetrator"); *White v. Commonwealth*, 9 Va.App. 366, 388 S.E.2d 645, 647 (1990) (displaying a knife to a victim is not so unusual as to serve as a signature), *overruled on other grounds after reh'g en banc, Lavinder v. Commonwealth*, 12 Va. App. 1003, 407 S.E.2d 910, 911 (1991); *Foster v. Commonwealth*, 5 Va.App. 316, 362 S.E.2d 745, 749 (1987) (testimony defendant approached victim with a small handgun and raped and robbed her "characterizes numerous offenses by other perpetrators" and is not so distinctive as to act as a signature).

[¶ 26] The minority opinion cites *State v. Martin*, 118 Idaho 334, 796 P.2d 1007, 1011 (1990), as authority for affirming the trial court's admission of the other acts evidence. The minority states: "Affirming the trial court under an abuse of discretion standard of review, the Idaho Supreme Court noted that in all three cases, the perpetrator used 'a kitchen knife to perpetrate the crime.'" Unfortunately, this brief summary creates the impression that the consistent use of a kitchen knife was sufficient to admit the other acts testimony. That is clearly not the holding in *Martin*. In fact, the *Martin* court identified a long list of similarities between the other acts and the charged offense:

(1) All were rape-type cases.

(2) All involved young, unattached women.

(3) All victims knew Martin.

(4) All rapes occurred in the victim's residence.

(5) All victims were surprised by their assailant.

(6) The assailant always wore some type of facial covering.

(7) The assailant always forced his way into the residence.

(8) The assailant always used a kitchen knife to perpetrate the crime.

(9) The knife always came from the victim's kitchen.

(10) The assailant always left the knife behind when fleeing.

(11) Apparently, the assailant always left without taking objects from the residence.

(12) The assailant always placed the knife by the victim's throat to perpetrate the crime.

(13) The assailant always threatened to kill the victim if she did not comply with his desires.

(14) The victims were all injured by the knife.

*Id.* 796 P.2d at 1011. The numerous and distinctive similarities detailed in *Martin* are noticeably absent in this case.

[¶ 27] When considered in combination, either a large number of common identifiers or a smaller number of highly distinctive characteristics may demonstrate a modus operandi. *United States v. Ingraham*, 832 F.2d 229, 233 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). "The more distinctive the identifiers, the fewer of them need be present to demonstrate the requisite signature." *Id.* (citations omitted). Here, the only similarities present in the prior bad acts and the crimes against Becky are the use of a knife, the desire to obtain sex, and the location of Moeller's residence within fifteen blocks or less of his victims' homes. As noted previously, these few facts are not so distinctive as to identify Moeller as the man who raped and murdered Becky O'Connell.

[¶ 28] Meanwhile, the marked dissimilarities between the other acts and the charged offenses defy any signature method that would identify Moeller as Becky's assailant. In allowing bad acts evidence to prove either identity or specific intent, our cases have routinely focused on two important factors: (1) similar victims and (2) similar crimes. *See State v. Christopherson*, 482 N.W.2d 298, 301–02 (S.D.1992); *Werner*, 482 N.W.2d at 289–90; *State v. Perkins*, 444 N.W.2d 34, 38 (S.D.1989); *State v. Titus*, 426 N.W.2d 578, 580 (S.D.1988); *Thomas*, 381 N.W.2d at 236–37; *State v. Roden*, 380 N.W.2d 669 (S.D. 1986); *State v. Means*, 363 N.W.2d 565, 568 (S.D.1985). As we observed in *Thomas*, 381 N.W.2d at 236 (quoting *People v. Williams*, 115 Cal.App.3d 446, 171 Cal.Rptr. 401, 404 (1981)):

"[E]vidence of other sex offenses having distinctive, similar characteristics to those charged is generally admissible on the issue of defendant's identity if such offenses are not too remote in time, *are sufficiently similar to the offense charged, and are committed upon persons similar to the prosecuting witness.*" (Emphasis supplied.)

[¶ 29] In this case, the victims and the crimes are decidedly different. Becky was a nine-year-old girl. The condition of her body and the presence of semen suggested that she was raped vaginally and anally  She was also brutally knifed and sustained several wounds to her hands trying to fend off her attacker. In contrast, two of the other acts victims were adult women, each twenty-one years of age. The third victim was a thirteen-year-old boy. The prior bad acts involved only attempts at sexual contact, with no vaginal or anal penetration. Except for a single cut to Moore's leg and Warner's hand, Moeller did not inflict any physical injuries on these victims. Moeller's demands for sexual gratification were thwarted when the assault victims showed resistance to his threats.

[¶ 30] Moeller's relationship to each of the victims is also very different. At trial, the State presented additional evidence to suggest Moeller was acquainted with Becky. According to one witness for the State, Moeller gave Becky a toy at a neighborhood rummage sale. Moeller sharply disputed any claim that he knew Becky and presented strong evidence indicating he was not present at the yard sale. Even if we accept State's contention that Moeller knew Becky, that does not create a similarity between Becky and the other victims. Moeller was a stranger to Beshaw, a neighbor of Moore's and a social acquaintance of Warner's. There is nothing in these disparate relationships that suggests a "modus operandi." Even State's brief to this Court seems to acknowledge that there is no identifiable similarity among the victims. The State writes:

What is apparent is that Defendant draws no distinction among his victims other than the opportunity to commit a sexual assault.

[¶ 31] The location of the crimes and Moeller's approach to the victims is also very different. Moeller assaulted Beshaw in her car. According to Beshaw's testimony at trial, he entered her vehicle uninvited and forced her to drive to a secluded area at knife-point. In contrast, Moore's assault occurred in Moeller's home. Rather than immediately threatening Moore with a knife, Moeller invited him into his home and even secured his father's permission for him to stay the night. He used artifice rather than threats to get him to drink large quantities of liquor and to submit to having his hands tied. He only pulled a knife on Moore after the boy refused to engage in sexual relations with him.

[¶ 32] Moeller's assault of Warner took place in her home. He did not immediately threaten her with a knife as with Beshaw nor did he attempt to trick her or intoxicate her as with Moore. Instead, he paid a social visit and, after securing permission to return another time, came back later that evening to commit the assault.

[¶ 33] In Becky's case, State theorized that Becky willingly accepted a ride in Moeller's pickup to avoid the rain.[3] Yet Moeller's purported offer of a ride does not reflect a method similar to those used in his earlier crimes. Unlike his assault of Beshaw, Moeller's alleged attack against Becky did not involve immediate force. Nor did he secure her parent's permission to visit his home or ply her with alcohol and bets as he did with Moore. Nor did he preface the attack with a social visit, as in Warner's case. It is abundantly clear that no modus operandi emerges from these disparate crimes.

[¶ 34] The inability to articulate similarities between the other acts and the charged offenses is apparent in State's closing argument to the jury:

When you think about these crimes you have to look at the crime scene. Where

---

3. The State premised this claim on the absence of bruises or marks which might suggest Becky was forced into a vehicle.

did these things happen? What are the factors that go into this? What time do these crimes happen? You have to compare the offender's personality, the person that is doing this. Was this crime a product of an opportunity? Impulse? Acting out a fantasy? Or was it planned? How does the offender approach his victim? Con them? Does he jump them? Is it surprise or blitz? You think about, and you're entitled to, on your experiences and what you know about in terms of the daily affairs of life, think about what you know about this type of crime in terms of those categories: A con, surprise or blitz. You see something interesting when you look at Mr. Moeller.

Unable to define concrete similarities among the other acts and the charged offenses, State failed to give the jury any clear guidance concerning the relevance of the other acts to legitimate issues in the case. Without more compelling direction from the State, the jury's verdict almost certainly rested on the forbidden inference that because Moeller was involved in other sexual assaults, he likely committed the offenses against Becky. This Court cannot permit a man to be convicted of rape and murder simply because he has committed other crimes in the past.

[¶ 35] Besides failing as proof of identity, the other acts evidence does not establish a "larger continuing plan, scheme or conspiracy of which the present crime charged at trial is only a part." *Champagne*, 422 N.W.2d at 842. The trial court's conclusion that each incident was "opportunistic, as opposed to a planned attack" and State's assertion that at least some of the crimes were unplanned, negates any claim that the crimes were part of a common or continuing scheme. Further, as one commentator aptly observed in regard to the plan or scheme exception:

"[S]urrounding circumstances must support an inference that the crimes were related in the defendant's mind," and both the other acts and the charged crime "must be part of a common or continuing scheme." It is not enough that other crimes resemble the charged crime. If they are not sufficiently similar to the charged offense or not distinctive enough

to be admitted to show *modus operandi* (hence identity), admitting other crimes to show plan or scheme merely because they bear some resemblance to the charged offense cannot be defended.

Particularly when other crimes or acts occurred long before the charged offense, admitting them on the theory that they prove plan often smacks of a thin fiction that merely disguises what is in substance the forbidden general propensity inference, which should not be allowed.

1 Mueller & Kirkpatrick, *supra*, § 113 at 667–68 (quoting Edward J. Imwinkelried, Uncharged Misconduct § 3:21 (1991)).

[¶ 36] The probative value of the prior bad acts evidence for other purposes, namely to show intent or motive, is also highly questionable. As to the rape charge, forensic evidence indicating anal and vaginal penetration and the presence of semen in nine-year-old Becky's body sufficiently established the assailant's general intent to commit rape. *See id.*, § 108 at 605. These facts also established that the perpetrator was "engaged in the perpetration of . . . rape" as required by the felony murder statute. SDCL 22-16-4. The perpetrator's motive, to satisfy a sexual need, is also abundantly clear by proving the rape itself. *See* 1 Mueller & Kirkpatrick, *supra*, § 110 at 625.

[¶ 37] As to the charge of premeditated murder, the circumstances surrounding Becky's death, including the brutality of the knife attack and the secluded location of the body, adequately demonstrated a "premeditated design to effect the death of the person killed." SDCL 22-16-4; *State v. Kost*, 290 N.W.2d 482, 486 (S.D.1980) (holding design to effect death may be inferred from the circumstances of the killing). Moeller's assaults on Beshaw, Moore, and Warner, where all three victims escaped with few or no physical injuries, provide scant evidence of a premeditated intent to murder. State's assertion that Moeller's motive for murder was to silence his victim can also be readily inferred from the murder itself, and Moeller's prior bad acts provide little additional probative force.

[¶ 38] While the other acts evidence had only meager probative value, its prejudicial

effects were substantial. " 'Prejudice does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.' " *State v. Iron Shell*, 336 N.W.2d 372, 375 (S.D.1983) (quoting 22 C. Wright & K. Graham, Federal Practice and Procedure § 5215 at 274–75 (1978)), *conviction rev'd on other grounds in habeas corpus proceeding, Iron Shell v. Leapley*, 503 N.W.2d 868 (S.D.1993). In this case, the likelihood that the other acts evidence would persuade by illegitimate means was particularly high. State's case against Moeller was a circumstantial one. To link Moeller to the rape and murder of Becky O'Connell, the State relied on evidence showing that: (1) an individual resembling Moeller had been seen approaching or talking to Becky before her disappearance; (2) a pickup truck similar to Moeller's had been seen near the crime scene; (3) soil on Moeller's pickup was consistent with soil samples taken from the crime scene; (4) Moeller had fled to another state when a police composite picture of the alleged assailant, which resembled Moeller, was published in a Sioux Falls newspaper; and (5) DNA samples showed Moeller has the same DQ Alpha type as the perpetrator, and this DQ Alpha type occurs in approximately one out of every thirteen Caucasians.

[¶ 39] The other acts testimony was a shocking and emotionally gripping contrast to State's sterile circumstantial case. Because there were no living witnesses to the rape and murder of Becky, the testimony of Beshaw, Moore, and Warner provided the only depiction of Moeller as a man engaged in sexual and physical aggression. Through their testimony, State transformed Moeller from a man who *could* have committed the crime, based on circumstantial evidence, to a man who *would* have committed the crime, based on a propensity for sexual predation and physical violence. Because Moeller had sexually assaulted others, the jury could readily infer that Moeller was the type of man who would rape and murder a child. This is precisely the type of propensity conclusion that is prohibited under SDCL 19–12–5.

## [¶ 40] C. Conclusion

[¶ 41] In this case, the probative value of the extrinsic evidence to show identity was slight, because the assaults on Beshaw, Moore and Warner were so dissimilar from the rape and murder of Becky O'Connell. Additionally, Moeller's purported intent and motives could be readily inferred from the circumstances surrounding Becky's rape and murder; the other acts testimony provided little, if any, additional insight on these issues. At the same time, given the offensiveness of the other acts and the brutality of the charged crimes, the likelihood of a prejudicial effect on the jury was exceedingly high.

[¶ 42] We conclude the trial court abused its discretion in admitting the other acts testimony; the danger of unfair prejudice so substantially outweighed the probative value of Moeller's prior bad acts that he was denied a fair trial. We therefore reverse his conviction and remand for a new trial. Due to the likelihood that other issues raised by Moeller will resurface on remand of this case, we will proceed to address these issues.

## ISSUE 2.

[¶ 43] **Did the trial court err in admitting the results of a DNA typing procedure known as polymerase chain reaction (PCR)?**

## [¶ 44] A. Facts

[¶ 45] The State performed a battery of serological tests on vaginal, anal/rectal and oral samples collected from Becky's body. The purpose of these tests was to determine the presence of body fluids that were foreign to Becky. The results showed spermatozoa on the anal/rectal swabs. For purposes of comparison, State also performed serological tests on blood samples drawn from Becky, Moeller, and other suspects. None of these tests involved DNA analysis.

[¶ 46] At a pretrial hearing, three defense experts testified that the serological analyses of the samples revealed polymorphic enzymes and a blood type which did not coincide with Moeller's makeup. State's experts countered that the blood type and enzyme results exactly matched Becky's test

results and, therefore, most likely reflected the victim's, rather than the perpetrator's, contribution to the sample. State claimed the serological tests revealed no conclusive or reliable information about the perpetrator and, therefore, Moeller could not be excluded as a suspect on the basis of these tests.

[¶ 47] To supplement the allegedly inconclusive serological findings, State sought admission of DNA test results performed by Edward Blake of Forensic Science Associates. Because the anal/rectal samples that revealed the sperm were too small to be tested using a more common method of DNA analysis known as Restriction Fragment Length Polymorphism (RFLP), Blake used a technique known as Polymerase Chain Reaction (PCR) to duplicate genetic material contained in the samples. Blake tested the resulting larger sample to determine the makeup of a particular segment on the DNA strand, a segment known as the HLA DQ Alpha gene complex. According to Blake, these tests revealed the perpetrator had a DQ Alpha type which was consistent with the DQ Alpha type of Donald Moeller. Blake further opined that population studies show this particular DQ Alpha type (1.2, 3) appears in approximately seven to eight percent of the Caucasian population, i.e. roughly one out of every thirteen Caucasians.

[¶ 48] Finding the admissibility requirements of the *Frye* test were satisfied, the trial court admitted Blake's testimony concerning the DNA test results and statistical data.[4]

[¶ 49] Moeller contends the DNA testing results, derived from the PCR method, are inadmissible for three reasons: (1) PCR DNA typing is not reliable for use with forensic evidence; (2) Edward Blake's qualifications and methods are inadequate; and (3) initial serological tests excluded Moeller as a suspect, so admission of PCR DNA typing was misleading and prejudicial. We disagree.

4. The *Frye* test refers to the standard of admissibility for scientific testimony which was estab-

[¶ 50] **B. Discussion**

[5] [¶ 51] The trial court has broad discretion concerning the admission of expert testimony, and the court's decision will not be reversed absent a clear showing of an abuse of discretion. *State v. Hill,* 463 N.W.2d 674, 676 (S.D.1990).

■ [¶ 52] As an initial matter, we must enunciate the appropriate test for admitting expert scientific testimony in a criminal trial. Moeller asserts the *Frye* standard applies to this case:

> Under the *Frye* test, before testimony relating to a scientific principle or discovery is admissible, the principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

*State v. Wimberly,* 467 N.W.2d 499, 505 (S.D. 1991) citing *State v. Adams,* 418 N.W.2d 618, 620 (S.D.1988) (citing *Frye,* 293 F. 1013). However, in *State v. Hofer,* 512 N.W.2d 482 (S.D.1994), we adopted the new rule set forth by the United States Supreme Court and held that general acceptance in the scientific community is no longer required. *Id.* at 484 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, ——, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993)). *See also State v. Schweitzer,* 533 N.W.2d 156, 159 (S.D.1995). The trial judge must simply determine "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Hofer,* 512 N.W.2d at 484 (citing *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2799, 125 L.Ed.2d at 485).

■ [¶ 53] Moeller attacks the DNA testimony of Blake under both the reliability and relevance prongs of the *Daubert* test. He contends the evidence does not rest on a reliable foundation, because PCR DNA typing is not valid in forensic settings and because Blake lacks sufficient qualifications and methods. Moeller also asserts that the evidence was not relevant, because serological tests had already excluded him as the perpetrator.

lished in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923).

**[¶ 54] 1. Reliability of PCR DNA typing for forensic use.**

[¶ 55] DNA (deoxyribonucleic acid) "is the 'genetic blueprint' or 'code' which makes each living organism, with the exception of identical twins, unique from all others. DNA is contained within every nucleated cell in the human body." Kamrin T. MacKnight, The Polymerase Chain Reaction (PCR): The Second Generation of DNA Analysis Methods Takes the Stand, 9 Computer & High Technology Law Journal 287, 290 (1993). Because DNA is unique among individuals, analyzing the DNA contained in skin, hair, blood, semen or saliva found at a crime scene can be helpful in identifying the perpetrator of the crime.

[¶ 56] At present, there are essentially two methods of forensic DNA analysis. William C. Thompson, Evaluating the Admissibility of New Genetic Identification Tests: Lessons from the "DNA War," 84 J.Crim. L. & Criminology 22, 26 (1993). The most widely used method is called DNA fingerprinting or DNA profiling. *Id.* It employs a technique known as Restriction Fragment Length Polymorphism (RFLP) analysis. *Id.* RFLP measures fragments of DNA that are known to show a great deal of variability among individuals. *Id.* at 26–27. By some accounts, RFLP analysis of these fragments "produces DNA profiles that are virtually unique to each individual, and thus are akin to fingerprints." *Id.* at 27. Because RFLP is so discriminating, it is possible to derive phenomenal probability statistics regarding whether a particular person is responsible for the crime under investigation. MacKnight, *supra,* at 299. For example, in one recent case using RFLP analysis, the frequency of the defendant's DNA profile in the Caucasian population was determined to be one in 300 million. *Id.* at 299 n. 48 (citing *United States v. Jakobetz,* 955 F.2d 786, 789 (2nd Cir.1992)). In *Wimberly,* 467 N.W.2d at 506, this Court held that DNA test results based on RFLP analysis were admissible against a criminal defendant. *See also Schweitzer,* 533 N.W.2d at 159–60 (holding statistical conclusions pertaining to RFLP test results are admissible).

[¶ 57] One major drawback of RFLP analysis is that it requires a relatively large, nondegraded DNA sample. *MacKnight, supra,* at 297–98. Unfortunately, many crime scenes, including the one involved in this case, yield only a minute amount of genetic information about the perpetrator. *Id.* at 297. PCR, the other current method of forensic DNA testing, is designed to overcome this obstacle. PCR is like a "genetic photocopy machine." *Id.* at 304. It is a laboratory technique that can increase the amount of testable DNA in a crime sample. Federal Judicial Center, Reference Manual on Scientific Evidence 287 (1994). As one treatise explains:

> PCR mimics DNA's self-replicating properties to make up to millions of copies of the original DNA sample in only a few hours. Although the term PCR often is used loosely to refer to the entire process of replicating DNA and testing for the presence of matching alleles, the term properly refers only to the *replication* portion of that process. After amplifying a DNA sample with PCR, technicians must use other methods to determine whether a known and unknown sample match. Standard RFLP analysis can be used in many circumstances, but other techniques often are used, including a process using *sequence-specific oligonucleotide* (SSO) *probes.* Currently, one locus, called HLA DQ Alpha, is available for this process.... HLA DQ Alpha ... has been completely sequenced and thus can be used for forensic typing.

*Reference Manual on Scientific Evidence, supra,* at 287–88 and n. 30.

> Following PCR amplification of the evidence samples, the DQ Alpha types are compared. If the DQ Alpha genotype of the suspect is different from that of the evidence sample, the suspect is "excluded" and cannot be the donor of the evidence.... If the suspect and the evidence have the same genotype, then the suspect is "included" as a possible source of the evidence sample. The probability that another, unrelated individual would also match the evidence is equal to the frequen-

cy of that genotype in the relevant population.

*MacKnight, supra,* at 310.

[¶ 58] Unfortunately, PCR DQ Alpha typing is not as discriminating as RFLP testing. MacKnight, *supra,* at 311–12; MacKnight *supra,* at 310. There are twenty-one different DQ Alpha types which range in frequency in the population from less than one to fifteen percent. MacKnight, *supra,* at 311. Consequently, the likelihood of a coincidental match between different samples is far higher with PCR than with DNA profiling tests. Thompson, *supra,* at 28–29.

[¶ 59] Moeller argues that PCR DQ Alpha typing is unreliable for use on crime scene evidence, because: (1) PCR is an experimental technique which has only been used in forensic settings since the late 1980s; (2) few forensic labs perform the test; (3) labs conducting PCR analysis are not subject to professional licensing, accreditation, or governmental regulation; and (4) PCR is susceptible to errors caused by inadvertent contamination of samples or uneven amplification of DNA.

[¶ 60] Undeniably, the use of PCR for forensic purposes has been the subject of controversy and debate in both scientific and legal contexts. National Research Council, DNA Technology in Forensic Science ix (National Academy Press 1992). Nevertheless, our review of the trial record, relevant case law, and scientific literature convinces us that PCR DQ Alpha typing is a reliable method of forensic identification.

[¶ 61] The fact that PCR DNA testing is a recent development, practiced by relatively few labs, does not necessarily impugn its scientific validity. As one court observed:

> The PCR method was, and is, being used in an increasing number of forensic situations. The absence of widespread forensic use of the PCR method is not determinative of the admissibility of DNA evidence produced by the method.

*State v. Lyons,* 124 Or.App. 598, 863 P.2d 1303, 1309–10 (1993) (citing *State v. Brown,* 297 Or. 404, 687 P.2d 751 (1984)), *review granted,* 319 Or. 406, 879 P.2d 1284 (1994). Furthermore, as of March 1991, over thirty forensic labs were performing DQ Alpha typing. MacKnight, *supra,* at 319. One commentator noted that concerns unrelated to the reliability of the technique, namely financial constraints, personnel shortages, inadequate space and equipment, and insufficient demand, prevent other forensic labs from using the technology. *Id.* at 319 n. 150.

[¶ 62] Contrary to Moeller's claims, the relative newness of the technique has not prevented serious scientific scrutiny. Evidence presented at trial indicated that literally thousands of scientific articles have been written about PCR amplification and the DQ alpha gene complex. The Federal Bureau of Investigation (FBI) has conducted validation studies indicating that PCR DQ Alpha typing is a valid procedure for forensic use. Catherine Theisen Comey et al., *PCR Amplification and Typing of the HLA DQ Alpha Gene in Forensic Samples,* 38 J. of Forensic Sciences 239, 248 (March 1993); Catherine Theisen Comey & Bruce Budowle, *Validation Studies on the Analysis of the HLA DQ Alpha Locus Using the Polymerase Chain Reaction,* 36 J. of Forensic Sciences 1633, 1646–47 (Nov 1991). Indeed, in 1992, the FBI adopted PCR DQ Alpha testing for forensic use. *State v. Russell,* 125 Wash.2d 24, 882 P.2d 747, 765 (1994) (citing AmpliType HLA DQ–Alpha Forensic DNA Typing Customer Survey (1992)), *cert. denied, Russell v. Washington,* —— U.S. ——, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995).

[¶ 63] Likewise, courts in many other jurisdictions have concluded that PCR DNA typing is scientifically reliable and therefore admissible in criminal cases. *Seritt v. State,* 647 So.2d 1, 4 (Ala.Crim.App.1994); *State v. Hill,* 257 Kan. 774, 895 P.2d 1238, 1247 (1995); *State v. Grayson,* No. K2–94–1298, 1994 WL 670312, at *1 (Minn.Dist.Ct.1994); *State v. Hoff,* 904 S.W.2d 56, 59 (Mo.Ct.App. 1995); *State v. Moore,* 268 Mont. 20, 885 P.2d 457, 474–75 (1994), *overruled on other grounds, State v. Gollehon,* 906 P.2d 697 (Mont.1995); *State v. Williams,* 252 N.J.Super. 369, 599 A.2d 960, 968 (Law Div.1991); *People v. Palumbo,* 162 Misc.2d 650, 618 N.Y.S.2d 197, 201 (N.Y.Sup.Ct.1994); *Lyons,* 863 P.2d at 1311; *Campbell v. State,* 910 S.W.2d 475, 479 (Tex.Crim.App.1995), *cert.*

denied, —— U.S. ——, 116 S.Ct. 1430, 134 L.Ed.2d 552 (1996); *Clarke v. State,* 813 S.W.2d 654, 655 (Tex.Ct.App.1991), *aff'd,* 839 S.W.2d 92 (Tex.Crim.App.1992), *cert. denied, Clarke v. Texas,* 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993); *Spencer v. Commonwealth,* 240 Va. 78, 393 S.E.2d 609, 621 (1990), *cert. denied,* 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990); *Russell,* 882 P.2d at 768.

[¶ 64] In attacking the reliability of PCR DQ Alpha testing, Moeller primarily relies on a report issued by the National Research Council (hereinafter *NRC Report)* entitled DNA Technology in Forensic Science (National Academy Press 1992). The report was prepared by a committee of scientists and jurists to address concerns associated with forensic DNA typing. *NRC Report* at ix. The report acknowledges questions about the reliability of PCR-based methods, including potential contamination of samples, uneven amplification of DNA, and misuse of PCR kits and equipment. *NRC Report* at 2–20 and 2–21. However, it does not translate to the broad condemnation urged by Moeller. Instead, we read the report as simply focusing on the importance of quality controls to ensure reliable testing. It recommends blind proficiency testing, individual certification, laboratory accreditation, and state or federal regulation to achieve that end. *NRC Report* at 4–13 to 4–15. As one court observed, the report's emphasis on quality control measures does not undermine the admissibility of PCR DNA typing:

> While accreditation and regulation may be desirable in the medical as well as the forensic setting, it is not necessary to bar the use of DNA technology until such safeguards are in place. "Although the court is not the ideal forum for ensuring quality science, the adversary process is a means by which those who practice 'bad' science may be discredited, while those who practice 'good' science may enjoy the credibility they deserve."

*Russell,* 882 P.2d at 766 (quoting MacKnight, *supra,* at 341).

[¶ 65] Moeller raises the possibility of contamination of PCR DNA samples as one ground for ruling PCR test results inadmissible. Crime scene evidence may contain a number of contaminants, including DNA from the victim and others present at the crime scene or from laboratory workers handling the sample. Moeller suggests that forensic PCR tests may reveal only genetic information from the contaminating source, thereby masking the DNA composition of the true perpetrator. Our review of scientific literature and the trial record indicates that the risk of contamination is not so great as to bar admissibility of PCR DNA results. To test the risk of contamination, FBI researchers conducted PCR analysis after deliberately exposing samples to environmental insults. Comey & Budowle, *supra,* at 1638–39. Potential contaminants were introduced by combining samples, mixing blood samples with perspiration, exposing samples to coughing, dandruff, and unclean laboratory equipment, and testing blood samples that were already mixed with other substances, such as saliva. *Id.* After performing PCR DQ Alpha analysis on the exposed samples, the researchers made the following conclusions:

> The DQ Alpha amplification and typing system was shown to be relatively unaffected by various environmental insults to bloodstains. Chemical and microbial contaminants that may be encountered in connection with evidentiary stains do not prevent obtaining interpretable typing results.
> . . . .

> . . . .

> In conclusion, PCR amplification of DNA from samples exposed to a variety of insults yields correct DQ Alpha typing results. The DQ Alpha alleles present in a sample at the level of sensitivity of the test were reliably detected, and no false results were produced as long as the test was carried out under conditions that prevented allele dropout. The typing system appears relatively resistant to a variety of environmental insults, and factors that do influence the test serve to give no results rather than false results.

*Id.* at 1646–47.

[¶ 66] In another validation study, FBI researchers compared the accuracy of forensic

PCR testing to RFLP analysis. They concluded as follows:

This study provides additional support that the HLA DQ Alpha typing procedure is a valid procedure for typing forensic samples. All interpretations for cases were compatible with interpretations using the RFLP procedure.

. . . .

The HLA DQ Alpha typing system has been shown to be a valid and reliable approach for analysis of biological evidence. It is anticipated that the increased sensitivity of the DQ Alpha test will provide results in some situations in which there is insufficient DNA for RFLP analysis.

Catherine Theisen Comey et al., *supra*, at 248. *See also* U.S. Congress, Office of Technology Assessment, Genetic Witness: Forensic Uses of DNA Tests 7–8 (1990) ("The Office of Technology Assessment (OTA) finds that forensic uses of DNA tests are both reliable and valid when properly performed and analyzed by skilled personnel.").

[¶ 67] In addition to these validation studies, the trial record indicates that Blake took great pains to ensure reliable testing procedures were followed in his laboratory. To prevent contamination of laboratory samples, Blake confined all handling of PCR material to one physical location in the lab and processed reference samples at different times than evidentiary samples. He used "blank" samples during PCR processing and typing to determine if chemicals added to the evidentiary samples were contaminated with DNA from other sources. Blake also reserved at least one-half of all evidentiary samples for possible retesting by his lab, defense experts, or referees.

[¶ 68] Moeller notes that preferential or differential amplification of certain portions of the DNA sample is also a concern with the PCR method. As Moeller suggests, uneven amplification could lead to inaccurate conclusions about the DNA makeup of the assailant. However, research suggests that proper use, calibration, and maintenance of equipment can prevent this problem. *MacKnight, supra,* at 314–15. Further, the

trial record indicates that Blake employed various precautions to ensure accurate amplification of samples. For example, Blake used control samples that had been previously typed to ensure that testing methods were capable of responding to all DQ Alpha types. Because uneven amplification of DNA is associated with inadequate heating of samples, Blake also monitored the temperatures maintained by the amplification equipment to ensure proper heating during the PCR process.

[¶ 69] Having reviewed the trial record, relevant case law, and scientific literature, we conclude that PCR DQ Alpha typing is sufficiently reliable for admission in criminal trials. In making this ruling, we note the benefit of PCR testing extends equally to the defense as well as the prosecution. Because test results can exclude a person on trial from being the perpetrator of the crime, PCR DNA evidence can be a valuable source of exculpatory evidence.

## [¶ 70] 2. Methods and qualifications of Edward Blake.

[¶ 71] Moeller questions Blake's qualifications to testify regarding PCR DNA typing, noting that: (1) Blake possesses only a bachelor of science degree in criminalistics and a doctorate degree in criminology and lacks any advanced degree in molecular biology, genetics, analytical chemistry, and biochemistry; (2) Blake and his laboratory are not licensed or accredited; and (3) Blake deviates from the protocols established by the manufacturer of the PCR kit by subjecting samples to three additional amplification cycles.

[¶ 72] We have held "the qualification and competency of a witness to speak as an expert is primarily in the discretion of the trial court, and its ruling will be disturbed only in the case of a clear abuse of discretion." *State v. Swallow,* 405 N.W.2d 29, 42 (S.D. 1987) (citing *State v. Disbrow,* 266 N.W.2d 246, 251–52 (S.D.1978)). None of Moeller's observations show an abuse of discretion by the trial court in permitting Blake to testify. Rather, evidence indicated Blake has the requisite knowledge and experience to quali-

fy as an expert. The record shows that, when studying for his doctorate in criminology, Blake specialized in forensic science. His doctoral thesis was entitled, "Determination of Genetic Markers in Human Semen." Since 1978, Blake has worked as a forensic serologist in private practice. Most of his work involves DNA analysis. He has co-authored more than twenty scientific papers, including articles concerning PCR technology and DNA analysis. He has also given over fifty presentations on various aspects of forensic serology. Blake has worked on over three hundred cases involving PCR DQ Alpha typing. Blake and his laboratory are not accredited or licensed because no such accreditation or licensing mechanisms exist. However, his laboratory participates in voluntary proficiency testing. Further, although Blake deviates from the manufacturer's protocol by subjecting samples to three additional replication cycles, he testified that these additional cycles simply increase the sensitivity of the sample. Finally, we note that other courts have deemed Blake to be an expert on PCR DNA typing. *See Hill*, 895 P.2d at 1246 (concluding that "Blake has impressive credentials and would appear to be one of the leaders in his field"); *Williams*, 599 A.2d at 967 (noting that qualified scientists found Blake's PCR DNA testing method to be highly reliable).

[¶ 73] The record demonstrates that Blake, through his education and practical experience, was qualified to testify as an expert on PCR DNA typing at trial. His alleged professional and technical deficiencies go to the weight and credibility of his testimony rather than admissibility. *See Swallow*, 405 N.W.2d at 42.

### [¶ 74] 3. Relevance of DNA results.

[¶ 75] Moeller asserts that the PCR DNA typing evidence was irrelevant, because he had already been excluded as a suspect on the basis of serological test results. At a pretrial hearing, Moeller presented three expert witnesses who testified that tests on semen and saliva found on Becky's body did not "match" Moeller's blood type or enzyme makeup. State presented expert testimony disputing Moeller's claim of exclusion.

State's experts opined that the serological tests reflected Becky's blood type and enzymes and therefore provided little, if any, information which could identify the perpetrator. State witnesses further opined that PCR DNA typing could differentiate between contributions from the perpetrator and the victim and thereby provide more information about the assailant. Faced with conflicting expert testimony and allegations that the serological tests were inconclusive, the trial court did not abuse its discretion in admitting evidence concerning the DNA makeup of the perpetrator.

### [¶ 76] 4. Conclusion.

[¶ 77] We conclude the court properly admitted evidence of PCR amplification and DQ Alpha testing. Based on the trial record, relevant case law, and scientific literature, we hold PCR analysis for forensic purposes is reliable, the testimony with respect to the technique and its application was offered by a qualified expert who used adequate scientific procedures, and the evidence was relevant to the material issue of the identity of the perpetrator.

### ISSUE 3.

[¶ 78] **Did the trial court abuse its discretion in allowing the testimony of a soil expert, because he testified to a mere possibility?**

### [¶ 79] A. Facts

[¶ 80] Prior to trial, Moeller submitted a motion to exclude the testimony of John P. Wehrenberg, a retired professor of geology who specializes in forensic examinations of soils. Moeller contended Wehrenberg's testimony was highly speculative and therefore had no probative value. The trial court denied the motion and Moeller entered a standing objection to the testimony at trial.

[¶ 81] Wehrenberg testified in State's case-in-chief. He stated he had examined soil samples taken from the wheel wells of a pickup belonging to Moeller. He had also studied several unpaved roads located near Sioux Falls, South Dakota, including the road leading into the area where Becky's body was found. In an on-site examination of this

road located south of Sioux Falls, he noted the colors and general characteristics of the soil on parts of this road were quite similar to soil samples taken from the left side of Moeller's pickup. Wehrenberg compared these samples to soil found on two other roads where Moeller claimed to have been driving. One road that lies across the river from the crime scene showed gravel and soils that were considerably lighter than any of the soils examined at the crime scene. Similarly, an examination of a gravel road north of Sioux Falls revealed gravel and soils that were much lighter than were present in the crime scene area. Wehrenberg opined that the soil on the left side of Moeller's pickup could not have come from the road he examined north of Sioux Falls. Wehrenberg also stated there was a low probability that the soils found on Moeller's pickup came from the road located across the river from the crime scene.

[¶ 82] In contrast, Wehrenberg opined that soils found on the left wheel wells of Moeller's vehicle were very similar to and consistent with soils taken from the crime scene. Further, Wehrenberg stated that samples from the left wheel wells of Moeller's pickup contained very sharp, clean hornblende crystals. Wehrenberg testified that the mud in the wheel wells would "probably have a greater chance of being found to the south [of Sioux Falls]" due to the presence of hornblende.

[¶ 83] Wehrenberg concluded that the road leading into the crime scene could not be excluded as the source of the soil found on the left wheel wells of Moeller's pickup.

[¶ 84] On cross-examination, Wehrenberg testified in part as follows:

Q. And basically your ultimate conclusion is that it is possible that soil in the left wheel well [of Moeller's vehicle] came from the crime scene?

A. That is correct.

Q. And it's also possible that it came from another scene; isn't that correct?

A. That is correct.

Q. And it, and without a database you don't know how many other scenes

there would be which would have this similar-type composition?

A. That's correct.

Q. And it could be, the range could be rather significant, couldn't it?

A. Yes, it could.

Q. And you can't say to any kind of scientific certainty that the soil in the wheel well and the soil at the crime scene are from the same source, would that be correct?

A. That's correct.

Q. All you're telling us is that as far as that wheel well it's possible?

A. Yes.

Q. And it's also, as you indicated, possible that it could be from any number of other sources?

A. That's correct.

## [¶ 85] B. Discussion

[¶ 86] Moeller asserts that Wehrenberg's testimony is limited to possibilities rather than probabilities and lacks any scientific conclusion. He therefore asserts the testimony did not assist the trier of fact and unfairly prejudiced Moeller. State responds that Moeller's assertions go to the weight of Wehrenberg's testimony, not admissibility. State notes that Wehrenberg found numerous consistencies between crime scene soil and the mud on Moeller's pickup and excluded locations Moeller identified as probable sources of the mud.

[¶ 87] The admissibility of an expert's opinion is within the broad discretion of the trial court. *Peery v. South Dakota Department of Agriculture*, 402 N.W.2d 695, 696 (S.D.1987); *State v. Iron Shell*, 301 N.W.2d 669, 672 (S.D.1981). We will reverse the trial court's decision only where there has been a clear showing of an abuse of discretion. *Id.; Hill*, 463 N.W.2d at 676 (citing *State v. Logue*, 372 N.W.2d 151 (S.D. 1985)).

[¶ 88] SDCL 19–15–2 addresses the admissibility of expert testimony. This statute requires that such testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." SDCL 19–15–2.

"Any fact that tends to connect an accused with the commission of a crime is relevant and has probative value." *State v. Johnson,* 316 N.W.2d 652, 654 (S.D.1982) (citing *State v. O'Connor,* 84 S.D. 415, 420, 172 N.W.2d 724, 727 (1969)). In this case, Wehrenberg's testimony indicated that soil found on Moeller's pickup was consistent with the crime scene. This testimony formed part of State's circumstantial case and tended to connect Moeller with the commission of the crime. Assertions that others may have been driving the pickup when the soil was deposited on it, or that Wehrenberg could not estimate the number of other locations where the soil could have been found, go to the weight of the testimony rather than its relevance.

[¶ 89] As one treatise explains:

Under our system, molded by the tradition of jury trial and predominantly oral proof, a party offers his evidence not *en masse,* but item by item. An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not ever make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to his case is quite another. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

*McCormick on Evidence, supra,* § 185 at 776.

[¶ 90] Furthermore, SDCL 19–15–2 does not require that expert testimony be given in the form of scientific probabilities. In drafting an identical Federal Rule, the advisory committee observed:

Most of the literature assumes that experts testify only in the form of opinions.

The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.

FedREvid 702 advisory committee's note.

[¶ 91] Although relevant, expert testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. SDCL 19–12–3. "[T]he term 'prejudice' does not mean damage to the opponent's case that results from the legitimate probative force of the evidence; rather it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *Kaarup v. Schmitz, Kalda & Assocs.,* 436 N.W.2d 845, 850 (S.D.1989) (citing *State v. Dokken,* 385 N.W.2d 493 (S.D.1986)).

[¶ 92] After reviewing the record, we cannot conclude that Wehrenberg's testimony was unduly prejudicial. Moeller's counsel artfully demonstrated the weaknesses and limitations of Wehrenberg's testimony, and Wehrenberg himself was quite candid in this regard. Furthermore, the subject matter of his testimony was not beyond the reach of the jury's critical faculties and common sense. Unfair prejudice is associated with "facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence." *McCormick on Evidence, supra,* § 185 at 780. It is highly unlikely that testimony concerning soil composition appealed to the jury's emotions or otherwise clouded their ability to weigh the probative value of the evidence. Consequently, we hold that the trial court did not abuse its discretion in permitting Wehrenberg to testify.

### ISSUE 4.

[¶ 93] **Does a trial court's failure to instruct the jury as to the definition of "reasonable doubt" at a sentencing hearing require reversal and vacation of the jury's verdict of death?**

[¶ 94] Before a sentence of death can be imposed under South Dakota's capital punishment sentencing scheme, the jury must determine the existence of an aggrava-

ting factor beyond a reasonable doubt. SDCL 23A–27A–5. In this case, the trial judge did instruct the jury that they must find the existence of an aggravating circumstance beyond a reasonable doubt before returning a verdict of death. However, the trial court did not define "reasonable doubt" at the penalty phase of the proceedings.[5]

[¶ 95] Although we dispose of this case on other grounds, we take this opportunity to stress the importance of defining the prosecution's burden of proof in a capital sentencing proceeding. In the future, failure to instruct the jury on this issue could result in reversible error.

## ISSUE 5.

[¶ 96] **Is the death penalty "cruel punishment" per se in violation of South Dakota Constitution Article VI, § 23?**

[¶ 97] The Eighth Amendment to the United States Constitution forbids "cruel and unusual punishments." The United States Supreme Court has held that the penalty of death is not per se unconstitutional as a cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 882–83 (1976).

[¶ 98] The South Dakota Constitution employs slightly different language in limiting the government's power to impose criminal penalties. Article VI, § 23, of the South Dakota Constitution states: "Excessive bail shall not be required, excessive fines imposed, *nor cruel punishments inflicted.*" (Emphasis supplied.) Moeller argues that South Dakota's constitutional prohibition on "cruel punishments" is a greater restriction on government power than its federal counterpart prohibiting "cruel and unusual punishments." He contends that the death penalty is invariably a "cruel punishment" in violation of this state's constitutional provision.

[¶ 99] We note that a state constitution may be interpreted to provide an individual with greater protection than the federal constitution. *State v. Opperman,* 247 N.W.2d 673, 674 (S.D.1976). Additionally,

"capital punishment is a matter of particular state interest or local concern and does not require a uniform national policy." *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 209 (1987). *See also* James R. Acker & Elizabeth R. Walsh, *Challenging the Death Penalty Under State Constitutions,* 42 Vanderbilt LRev 1299 (1989).

[¶ 100] Cognizant of this Court's independent authority to invalidate capital punishment as a matter of state law, we begin our analysis by focusing on our own state's legal and historical precedent. Importantly, the very same constitutional document that prohibits the infliction of cruel punishment contains provisions implicitly recognizing the appropriateness of the death penalty. S.D. Const.Art. VI, § 8, states in part: "All persons shall be bailable by sufficient sureties, *except for capital offenses* when proof is evident or presumption great." (Emphasis supplied.) Article VI, § 2, provides in pertinent part: "No person shall be deprived of life . . . without due process of law."

[¶ 101] In addition to constitutional recognition, capital punishment has received legislative approval. The death penalty has been in effect for most of this state's history. Capital punishment existed from statehood until it was abolished in 1915. *Opinion of the Judges,* 83 S.D. 477, 479, 161 N.W.2d 706, 708 (1968). It was reinstated in 1939 and continued until 1972, when the United States Supreme Court effectively invalidated the then-existing capital sentencing scheme. Reed C. Richards & Stephen C. Hoffman, *Death Among the Shifting Standards: Capital Punishment After Furman,* 26 SDLRev 243 (Spring 1981). The legislature reenacted the death penalty in 1979, and it has remained in effect to the present. Richards & Hoffman, *supra,* at 243; 1979 S.D.Sess.L. ch. 160; 1981 S.D.Sess.L. ch. 186. Eleven individuals have been executed in South Dakota. Richards & Hoffman, *supra,* at 243.

[¶ 102] Historical and legislative acceptance of the death penalty is significant, but not dispositive. *See State v. Black,* 815

---

5. We note that the jury received a proper definition of reasonable doubt at the guilt phase of their deliberations. However, this fact does not

diminish the importance of repeating the instruction prior to penalty deliberations that occur several days later.

S.W.2d 166, 188 (Tenn.1991). Constitutional analysis is dynamic and evolving; it cannot rest solely on historical underpinnings. We therefore adopt a three-part analytical framework derived from the United States Supreme Court's plurality decision in *Gregg*. To survive constitutional scrutiny, the death penalty: (1) must comport with contemporary standards of decency; (2) must not be excessive in light of the crime committed; and (3) must serve a legitimate penological objective. *Gregg*, 428 U.S. at 173–83, 96 S.Ct. at 2924–30, 49 L.Ed.2d at 874–80.

[¶ 103] We conclude that capital punishment meets all three of these requirements. To begin with, the death penalty comports with South Dakotans' contemporary standards of decency. Because the legislative branch is most representative of the views of the people, legislative enactments are one of the most accurate indicators of societal mores. *Gregg*, 428 U.S. at 179–81, 96 S.Ct. at 2928–29, 49 L.Ed.2d at 878–79; *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 968 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *Black*, 815 S.W.2d at 189; *State v. Campbell*, 103 Wash.2d 1, 691 P.2d 929, 948 (1984), *cert. denied*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 526 (1985). The South Dakota Legislature reenacted the death penalty in 1979, and has made occasional amendments to the statutory scheme since that time. 1979 S.D.Sess.L. ch. 160; 1981 S.D.Sess.L. ch. 186; 1989 S.D.Sess.L. ch. 206; 1992 S.D.Sess.L. ch. 173; 1994 S.D.Sess.L. ch. 178; 1995 S.D.Sess.L. ch. 132. These statutes have remained undisturbed by the electorate, despite the power of the people to vote death penalty proponents out of office or to reject legislative enactments through a referendum election. This public acquiescence is strong evidence that capital punishment reflects the will of the people of South Dakota.

[¶ 104] The jury is also a reliable, objective index of societal standards. *Gregg*, 428 U.S. at 181, 96 S.Ct. at 2929, 49 L.Ed.2d at 879. Since the reenactment of the death penalty in 1979, eight capital cases have been submitted to juries for sentencing. In two of these cases, South Dakota juries have recommended death sentences. In our sparsely populated rural state, with its relatively small number of capital crimes, these two verdicts are significant. Furthermore, "the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment *per se*. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases." *Gregg*, 428 U.S. at 182, 96 S.Ct. at 2929, 49 L.Ed.2d at 879–80 (citing *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)).[6]

[¶ 105] Having determined the death penalty is consistent with contemporary values in South Dakota, we also conclude that the sentence of death is not an excessive penalty for the crime of first-degree murder.[7]

> Measuring the punishment, death, against the crime, causing death, it is most difficult to appreciate the death penalty's excessiveness.... [A]lthough the death penalty is severe and irrevocable, it is not an excessive or disproportionate penalty for the crime of murder.

*Ramseur*, 524 A.2d at 213. Imposing a sentence of death for deliberately taking the life

---

6. In evaluating contemporary values, we are also mindful of the fact that thirty-seven other states have adopted statutes authorizing capital punishment for certain crimes. *See Campbell*, 691 P.2d at 947. In the four other states which include a simple prohibition against "cruel punishment" in their constitutions, the death penalty has survived state constitutional challenges. *State v. Dickerson*, 298 A.2d 761, 768 (Del.Supr.Ct.1972); *Gall v. Commonwealth*, 607 S.W.2d 97, 113 (Ky. 1980), *cert. denied*, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981); *Zettlemoyer*, 454 A.2d at 969; *Campbell*, 691 P.2d at 948.

7. Under South Dakota law, kidnapping may be punishable by death when the defendant has inflicted gross permanent physical injury on the victim. SDCL 22–19–1; SDCL 22–6–1. Moeller was not charged with kidnapping Becky. He was convicted of murder in the first degree and was sentenced to death for this crime. Therefore, we limit our discussion to the appropriateness of the death penalty for the offense of first-degree murder.

of another "is an extreme sanction, suitable to the most extreme of crimes." *Gregg,* 428 U.S. at 187, 96 S.Ct. at 2932, 49 L.Ed.2d at 882.

[¶ 106] Finally, the death penalty serves two important penological purposes. First, it satisfies society's need to impose a fitting punishment for grievous crimes. As the *Gregg* plurality observed:

> In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

> The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law. Retribution is no longer the dominant objective of the criminal law, but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.

*Gregg,* 428 U.S. at 183–84, 96 S.Ct. at 2930, 49 L.Ed.2d at 880–81 (citations and quotations omitted).

[¶ 107] Second, we accept the State's assertion that the death penalty deters prospective capital offenders. Although the efficacy of capital punishment as a deterrent of crime is hotly debated, this question must be addressed by the legislature, not the courts. As the *Gregg* plurality opined:

> The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.

*Gregg,* 428 U.S. at 186, 96 S.Ct. at 2931, 49 L.Ed.2d at 882 (citation omitted).

[¶ 108] Justice Byron White has similarly defended the legislature's ability to assess the deterrent value of capital punishment:

> It will not do to denigrate these legislative judgments as some form of vestigial savagery or as purely retributive in motivation; for they are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons. This concern for life and human values and the sincere efforts of the States to pursue them are matters of the greatest moment with which the judiciary should be most reluctant to interfere.

*Roberts v. Louisiana,* 428 U.S. 325, 355, 96 S.Ct. 3001, 3016, 49 L.Ed.2d 974, 994 (1976). We cannot conclude that the South Dakota Constitution requires such interference.

[¶ 109] In light of the above, we hold that the death penalty is not invariably cruel punishment in violation of the state constitution.

## ISSUE 6.

[¶ 110] **Is SDCL 23A–27A–1(6) unconstitutionally vague and overly broad when it states an aggravating factor for imposing the death penalty is whether the "offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim?"**

[¶ 111] As we explained in *State v. Rhines,* 1996 SD 55 ¶¶ 138–40, 548 N.W.2d 415:

> The Eighth and Fourteenth Amendments to the United States Constitution prohibit state sentencing systems that cause the death penalty to be wantonly and freakishly imposed. *Lewis v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606, 618 (1990).

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.

Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion. It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

*Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398, 406 (1980) (Stewart, J., plurality opinion) (citations and quotations omitted).

"A State's definitions of its aggravating circumstances—those circumstances that make a criminal defendant 'eligible' for the death penalty—therefore play a significant role in channeling the sentencer's discretion." *Lewis,* 497 U.S. at 774, 110 S.Ct. at 3099, 111 L.Ed.2d at 619. To satisfy constitutional mandates, an aggravating circumstance must meet two basic requirements. First, it "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249–50 (1983). Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa v. California,* 512 U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750, 759 (1994). A challenged provision is impermissibly vague when it fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with open-ended discretion. *Maynard v. Cartwright,* 486 U.S. 356, 361–62, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372, 380 (1988).

... [U]nder the South Dakota sentencing statutes, the jury may not recommend a sentence of death unless it finds at least one aggravating circumstance beyond a reasonable doubt. South Dakota includes the following aggravating circumstance in its statutory scheme:

> The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

SDCL 23A–27A–1(6).[8]

■ [¶ 112] State alleged this circumstance in urging the jury to impose the death sentence on Moeller. As to the meaning of this statutory provision, the trial court instructed the jury as follows:

> The term "aggravated battery" as used in these instructions, is defined as the infliction of serious physical abuse upon the victim, by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof.

> The State has alleged as an aggravating circumstance in this case that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. The State has the burden to prove, beyond a reasonable doubt, the existence of this aggravating circumstance. Before you may find that this aggravating circumstance exists in this case, you must find, beyond a reasonable doubt, that each of the following elements of this aggravating circumstance are proven by the evidence:

> (1) That the victim suffered an aggravated battery to his person, inflicted by the defendant.

> (2) That the defendant, at the time that he inflicted the aggravated battery upon the victim, had the specific intention, design or purpose of maliciously inflicting unnecessary pain to the victim.

> Unless the jury finds that each of the above two elements has been proven by the evidence, beyond a reasonable doubt, then you must give the defendant the ben-

---

**8.** In 1995, the legislature added the following sentence to SDCL 23A–27A–1(6): "Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age." 1995 SDSessL ch 132. Because Moeller's alleged offenses occurred prior to the enactment of this amendment, we may not consider this statutory change when reviewing his case. *See* S.D.Const. Art. VI, § 12.

efit of the doubt and find that this aggravating circumstance does not exist.[9]

The jury found the aggravating circumstance was satisfied and sentenced Moeller to death.

[¶ 113] Moeller contends the aggravating circumstance at SDCL 23A–27A–1(6) and the narrowing instructions given by the trial court are unconstitutionally vague and overbroad and, therefore, violate his rights under the "cruel and unusual punishment" and "due process" clauses of the United States and South Dakota Constitutions.[10] State counters that the trial court's instructions to the jury cured any constitutional infirmity in the statute by narrowly defining "aggravated battery." [11]

[¶ 114] We have previously written: .

There is little doubt that the language of SDCL 23A–27A–1(6), by itself, is vague and overbroad. In *Godfrey,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, the Court considered a provision identical to South Dakota's "outrageously or wantonly, vile, horrible or inhuman" circumstance. The trial court in *Godfrey* simply quoted the aggravating circumstance in its instructions to the jury and provided no additional definitions or explanations concerning this aggravating factor. 446 U.S. at 426, 100 S.Ct. at 1764, 64 L.Ed.2d at 405. The jury found beyond a reasonable doubt that the two murders committed by the defendant were "outrageously or wantonly vile, horrible and inhuman" and imposed the penalty of death. *Id.* The Georgia Supreme Court affirmed the sentence, without applying any limiting construction to the aggravating circumstance. 446 U.S. at

432, 100 S.Ct. at 1767, 64 L.Ed.2d at 408–09. On appeal, the United States Supreme Court invalidated the death sentence. 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. Justice Stewart, writing for the plurality, condemned the trial court's bare reiteration of the statutory aggravating circumstance in its charge to the jury. 446 U.S. at 428–29, 100 S.Ct. at 1765, 64 L.Ed.2d at 406–07. He reasoned that the statutory provision, by itself, failed to give the jury adequate guidance in imposing the death penalty and therefore created the likelihood of an arbitrary and capricious result. 446 U.S. at 428–29, 100 S.Ct. at 1765, 64 L.Ed.2d at 406–07; *see also Maynard,* 486 U.S. at 363–64, 108 S.Ct. at 1859, 100 L.Ed.2d at 382 (invalidating "especially heinous, atrocious, or cruel" aggravating factor where no additional limiting construction was given); *Espinosa v. Florida,* 505 U.S. 1079, 1080, 112 S.Ct. 2926, 2927–28, 120 L.Ed.2d 854, 858–59 (1992) (stating simple charge to jury that murder was "especially wicked, evil, atrocious or cruel" did not satisfy constitutional requirements).

Finding the statutory language is vague and overbroad, as the *Godfrey* Court did, does not necessarily establish a constitutional violation. *Walton,* 497 U.S. at 653–54, 110 S.Ct. at 3057, 111 L.Ed.2d at 528. If a state court further defines and limits those otherwise vague and overbroad terms so as to provide adequate guidance to the sentencer, then constitutional requirements are satisfied. *Id.*

9.  The trial court also provided a definition of "torture" and "depravity of mind" for the jury. However, we read the jury instructions as alleging only an "aggravated battery" and therefore confine our review to the definition of that term.

10.  Although Moeller urges state as well as federal constitutional violations, *see* S.D.Const.Art. VI, §§ 2, 18, and 23, we conclude that the effect of both the federal and state constitutions in this regard is identical.

11.  Moeller argues that a vague and overbroad aggravating circumstance must be amended through legislative action rather than limited through judicial construction. He contends that limiting instructions crafted by a trial or appel-

late court invade the legislature's power to define capital offenses.

We reject this claim. The United States Supreme Court has expressly approved judicial decisions that impose limiting instructions on otherwise vague aggravating circumstances. *Arave v. Creech,* 507 U.S. 463, 471, 113 S.Ct. 1534, 1541, 123 L.Ed.2d 188, 198 (1993); *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511, 528–29 (1990); *Proffitt v. Florida,* 428 U.S. 242, 255–57, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 924–25 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Gregg,* 428 U.S. at 201, 96 S.Ct. at 2938, 49 L.Ed.2d at 890 (opinion of Stewart, Powell, and Stevens, JJ.). We are convinced by the weight of this authority.

*Rhines,* 1996 SD 55, ¶¶ 144–45, 548 N.W.2d 415.

[¶ 115] We hold that the trial court's instructions meet the mandates of the state and federal constitutions. To begin with, the court's instructions narrow the class of persons eligible for the death penalty. The jury was advised that it could only impose a death sentence if the victim suffered an aggravated battery. The court defined an aggravated battery as "the infliction of serious physical abuse upon the victim, by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof." By requiring "serious physical abuse," this instruction eliminates defendants who kill without inflicting physical blows. For example, the defendant who administers an overdose of medication to his victim, or poisons his victim with carbon monoxide gas, does not satisfy the "serious physical abuse" requirement. Furthermore, the court required a finding that the defendant had the specific intent to maliciously inflict unnecessary pain to the victim. " 'Unnecessary pain' implies suffering in excess of what is required to accomplish the murder." *Rhines,* 1996 SD 55 ¶ 161, 548 N.W.2d 415 (citing *Ramseur,* 524 A.2d at 229 (citing *State v. Sonnier,* 402 So.2d 650, 658–60 (La.1981), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983))). The defendant who intends to kill his victim instantly or painlessly does not satisfy this requirement, nor does the defendant who only intended to cause pain that is incident to death. *Rhines,* 1996 SD 55 ¶ 161, 548 N.W.2d 415 (citing *Ramseur,* 524 A.2d at 229–30).

[¶ 116] The trial court's limitations also provided a justifiable distinction between those individuals who deserve the death penalty and those who do not. *See Lewis,* 497 U.S. at 776, 110 S.Ct. at 3099–100, 111 L.Ed.2d at 619–20 (citations omitted). Leniency may be appropriate when a defendant causes a quick and painless death, but when a murderer dismembers or disfigures his victim with a malicious intent to inflict pain, society is justified in imposing the ultimate punishment of death. The law need not be merciful in the face of brutal and torturous violence.

[¶ 117] Finally, the trial court's limiting instructions provide meaningful guidance to the jury. Rather than relying on pejorative adjectives that appeal to emotion and caprice, *see Shell v. Mississippi,* 498 U.S. 1, 2–3, 111 S.Ct. 313, 314, 112 L.Ed.2d 1, 4–5 (1990) (Marshall, J., concurring) (citing *Cartwright v. Maynard,* 822 F.2d 1477, 1488 (10th Cir. 1987) (en banc)), the trial court enunciated clear and objective standards for imposing the death penalty. The instructions required the jury to make precise factual inquiries regarding the nature of the victim's injuries and the defendant's intent. By establishing these factual requirements, the trial court foreclosed arbitrary and capricious decision-making.

[¶ 118] The United States Supreme Court has approved limiting instructions similar to those used by the trial court. In *Walton,* 497 U.S. at 652, 110 S.Ct. at 3057, 111 L.Ed.2d at 528, the Court considered an aggravating circumstance that imposed the death penalty for crimes that are "especially heinous, cruel, or depraved." The Court upheld the state court's limiting construction that " 'a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death,' " and that " '[m]ental anguish includes a victim's uncertainty as to his ultimate fate.' " 497 U.S. at 654, 110 S.Ct. at 3057–58, 111 L.Ed.2d at 529 (quoting *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017, 1032 (1989)). The Court also validated the instruction that a crime is committed in an especially "depraved" manner, when the perpetrator " 'relishes the murder, evidencing debasement or perversion,' " or " 'shows an indifference to the suffering of the victim and evidences a sense of pleasure' in the killing." 497 U.S. at 655, 110 S.Ct. at 3058, 111 L.Ed.2d at 529 (quoting *Walton,* 769 P.2d at 1033). Likewise, in *Arave,* 507 U.S. at 471, 113 S.Ct. at 1539, 123 L.Ed.2d at 198, the Court considered an aggravating circumstance that required the defendant exhibit "utter disregard for human life." The Idaho Supreme Court had interpreted the phrase as " 'reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, *i.e.,* the cold-blood-

ed, pitiless slayer.'" 507 U.S. at 468, 113 S.Ct. at 1539, 123 L.Ed.2d at 196 (quoting *State v. Creech*, 105 Idaho 362, 670 P.2d 463, 471 (1983)). The High Court held that the "utter disregard" circumstance, as interpreted by the Idaho Supreme Court, passed constitutional muster because it required an objective determination by the sentencer:

> In ordinary usage ... the phrase "cold-blooded, pitiless slayer" refers to a killer who kills without feeling or sympathy.... The terms "cold-blooded" and "pitiless" describe the defendant's state of mind: not his *mens rea* but his attitude toward his conduct and his victim. The law has long recognized that a defendant's state of mind is not a "subjective" matter, but a *fact* to be inferred from the surrounding circumstances.

*Arave*, 507 U.S. at 472–73, 113 S.Ct. at 1541, 123 L.Ed.2d at 199 (citations omitted) (emphasis in original). *See also Maynard*, 486 U.S. at 364–65, 108 S.Ct. at 1859, 100 L.Ed.2d at 382 (indicating approval of state court definitions that limit the death penalty to murders involving "torture or serious physical abuse"); *Proffitt*, 428 U.S. at 255–56, 96 S.Ct. at 2968, 49 L.Ed.2d at 924–25 (opinion of Stewart, Powell, and Stevens, JJ.) (stating "especially, heinous, atrocious or cruel" circumstance adequately guides the sentencer when it is limited to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim").

[¶ 119] Other states employing the "vile, horrible and inhuman" circumstance have adopted interpretations that similarly limit the scope of the statute so as to satisfy constitutional requirements. The New Jersey Supreme Court has written:

> Torture or aggravated battery to the victim shall be found if the defendant intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death, "severity" measured either by the intensity of the pain, or the duration of the pain, or a combination of both.

*Ramseur*, 524 A.2d at 231. The Virginia Supreme Court construes the phrase "aggravated battery" to mean "a battery which, qualitatively and quantitatively, is more cul-pable than the minimum necessary to accomplish an act of murder." *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135, 149 (1978) (citations omitted), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979). Under Virginia's interpretation, an aggravated battery may include mutilation, gross disfigurement, or sexual assault of a conscious victim prior to death. *Jones v. Commonwealth*, 228 Va. 427, 323 S.E.2d 554, 565 (1984), *cert. denied*, 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985).

[¶ 120] The Georgia Supreme Court even more closely approximates the interpretation offered by the trial court here:

> [A]n aggravated battery occurs when a person maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof. In order to find that the offense of murder involved an aggravated battery, you must find that the bodily harm to the victim occurred before death.

*West v. State*, 252 Ga. 156, 313 S.E.2d 67, 71 (1984).

[¶ 121] In light of the weight of state and federal authority, we hold that the vile, horrible and inhuman circumstance, as limited by the trial court's instructions, adequately channels the sentencer's discretion as required by the state and federal constitutions.

### ISSUE 7.

[¶ 122] **Do provisions of SDCL ch. 23A–27A provide insufficient guidance to the sentencer and permit a death sentence to be imposed arbitrarily in violation of the Eighth Amendment to the United States Constitution and Article VI, §§ 2, 18, and 23, of the South Dakota Constitution?**

[¶ 123] This Court stated in *Rhines*, 1996 SD 55 at ¶ 78, 548 N.W.2d 415:

> When the jury returns a guilty verdict in a capital case, the trial court must conduct a presentence hearing before the jury. SDCL 23A–27A–2. At that time, the jury may hear additional evidence in mitigation and aggravation of punishment. *Id.* Under South Dakota's capital sentencing statutes,

the jury must find the existence of an aggravating circumstance beyond a reasonable doubt before it may impose the death penalty. SDCL 23A–27A–4 and –5. The law permits the jury to consider any mitigating circumstances, but does not impose any standard of proof regarding mitigation. SDCL 23A–27A–1 and –2.

[¶ 124] Moeller contends the capital sentencing statutes are constitutionally infirm because they do not instruct the jury on how to weigh the aggravating circumstances against mitigating factors. More specifically, Moeller argues the capital sentencing statutes fail to adequately channel the discretion of the sentencer, because there is no standard of proof for mitigation and it is unclear whether a certain number of jurors must decide mitigation exists. He also contends that discretion exercised by police and prosecutors in deciding whether to charge the defendant with a capital offense contributes to the arbitrary imposition of the death penalty. We consider each of Moeller's contentions in turn.

### [¶ 125] 1. Absence of a standard of proof for mitigation.

[¶ 126] Moeller asserts that death sentences will be arbitrarily imposed in violation of the state and federal constitutions, because the South Dakota capital sentencing statutes do not include a standard of proof for mitigating circumstances or otherwise explain how the jury should weigh evidence of mitigation against aggravating circumstances.

[¶ 127] We rejected this argument in another capital case, and we need not reiterate our reasoning here. *Rhines*, 1996 SD 55 ¶¶ 79–82, 548 N.W.2d 415.

### [¶ 128] 2. Should mitigation be found by a certain number of jurors?

[¶ 129] Moeller notes that the South Dakota sentencing statutes do not specify whether a certain number of jurors must find mitigating factors exist before such factors can influence their sentence recommendation. He contends that this lack of guidance creates the likelihood that the jury will impose the death sentence arbitrarily.

[¶ 130] We reject this argument. Requiring a certain number of jurors to agree on the mitigating value of evidence would likely foster rather than prevent arbitrary results. In *McKoy v. North Carolina*, 494 U.S. 433, 443–44, 110 S.Ct. 1227, 1233–34, 108 L.Ed.2d 369, 381 (1990), the United States Supreme Court invalidated a requirement that the jury consider only those mitigating circumstances that it unanimously finds. The Court reasoned "it would be the 'height of arbitrariness to allow *or* require the imposition of the death penalty' where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence." *McKoy*, 494 U.S. at 440, 110 S.Ct. at 1232, 108 L.Ed.2d at 379 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8 (1982)). The same rationale would apply if a certain portion of the jury was required to agree on the mitigating value of specific evidence; a handful of holdout jurors could prevent the others from giving effect to evidence that they believe calls for a sentence less than death. *See McKoy*, 494 U.S. at 439, 110 S.Ct. at 1231, 108 L.Ed.2d at 378. It is imperative that the jury be permitted to weigh all relevant mitigating evidence, and any attempt to limit consideration of such evidence is rejected by this Court.

### [¶ 131] 3. Discretion exercised by police, prosecutors and others results in the arbitrary imposition of death sentences.

[¶ 132] Moeller also argues that the death penalty is arbitrarily imposed because discretion is exercised by police, prosecutors and others in pursuing murder convictions. The United States Supreme Court has rejected similar arguments and we agree with their reasoning. Prosecutorial discretion allows a defendant to be removed from consideration as a candidate for the death penalty. *Gregg*, 428 U.S. at 199, 96 S.Ct. at 2937, 49 L.Ed.2d at 889. The decision to afford an individual defendant mercy does not violate state or federal constitutional guarantees. *See id.* Case law only requires that the sentencer's decision to impose the death penalty be guided by standards that focus "on the particularized circumstances of the crime

and the defendant." *Id.* Attempts to eliminate discretion in all aspects of the criminal justice system place totally unrealistic conditions on the use of capital punishment. 428 U.S. at 199–200 n. 50, 96 S.Ct. at 2937–38 n. 50, 49 L.Ed.2d at 889 n. 50. As the *Gregg* Court explained:

> [I]t would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited. Such a system, of course, would be totally alien to our notions of criminal justice.

428 U.S. at 199–200 n. 50, 96 S.Ct. at 2937–38 n. 50, 49 L.Ed.2d at 889 n. 50.

[¶ 133] We deem it unnecessary to consider other issues that are rendered moot by our reversal of Moeller's conviction.

[¶ 134] AMUNDSON, J., JOHNSON and ZINTER, Circuit Judges, concur.

[¶ 135] GILBERTSON, J., concurs in part and dissents in part.

[¶ 136] JOHNSON, Circuit Judge, sitting for SABERS, J., disqualified.

[¶ 137] ZINTER, Circuit Judge, sitting for KONENKAMP, J., disqualified.

GILBERTSON, Justice (concurring in part and dissenting in part).

### [¶ 138] ISSUE ONE

DID THE TRIAL COURT ABUSE ITS DISCRETION IN ADMITTING "PRIOR BAD ACTS" EVIDENCE INVOLVING THREE SEXUAL ASSAULTS COMMITTED BY MOELLER IN 1973, 1979, AND 1990?

[¶ 139] I respectfully dissent as to the rationale and result of Issue One. I would affirm the trial court on this evidentiary ruling.

SDCL 19–12–5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

[¶ 140] The trial court admitted the testimony of Moeller's attacks upon Carolyn Beshaw in 1973, Kenneth Moore in 1979 and Tracy Warner in 1990. In so doing, the trial court correctly applied the two criteria necessary to make such a decision:

(1) Whether the intended purpose for offering the other acts evidence is relevant to some material issue in the case, and

(2) Whether the probative value of the evidence is substantially outweighed by its prejudicial effect.

*State v. Werner,* 482 N.W.2d 286, 288 (S.D.1992)(citing *State v. Basker,* 468 N.W.2d 413, 415 (S.D.1991)). The trial court found the evidence was relevant to show common method, plan or scheme, intent, identity, and motive and that the probative value was not substantially outweighed by the danger of unfair prejudice.

[¶ 141] Crucial to analysis of this issue is the standard of review. A trial court's determination to admit other acts evidence will not be overruled absent an abuse of discretion. *State v. Larson* 512 N.W.2d 732, 736 (S.D. 1994); *State v. McDonald,* 500 N.W.2d 243, 245 (S.D.1993); *Werner,* 482 N.W.2d at 288.

> An abuse of discretion has been defined by this Court as a decision which is not justified by, and clearly against reason and evidence. We will not reverse a decision if 'we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion.'

*Dakota Cheese v. Taylor,* 525 N.W.2d 713, 715 (S.D.1995) (citations omitted); *State v. Erickson,* 525 N.W.2d 703, 710 (S.D.1994). "Upon review ... we must be careful not to substitute our reasoning for that of the trial

court." *Larson,* 512 N.W.2d at 736. Thus, the question is not whether, had we been the trial judge, we would have admitted the prior bad acts evidence but whether the trial court sitting in this case abused its discretion by doing so. *Id.; State v. Rufener,* 392 N.W.2d 424, 426 (S.D.1986).

[¶ 142] Unfortunately, the majority devotes only a single sentence to this standard upon which the entire issue hinges before proceeding into a lengthy analysis which is more appropriate to a de novo review rather than applying the abuse of discretion criteria cited above. This is most clearly established by the fact that in the entire text of this discussion, the majority devotes not a single paragraph to an analysis of the similarities between the attack on Becky and the prior bad acts. Instead, the majority focuses entirely on perceived dissimilarities and justifications not to affirm the trial court rather than balancing the facts that weigh for or against admission and applying an in-depth abuse of discretion review.

[¶ 143] *I. Relevance*

[¶ 144] As noted above, the trial court found the prior bad acts were relevant to show common method, plan or scheme, intent, identity and motive. Contrary to the majority's assertion that the trial court only identified five common marks between the crimes charged in the indictment and the prior bad acts, the trial court actually identified ten. They are as follows:

(a) Each involved a folding knife similar to a Buck brand knife with approximately the same or similar length blade.

(b) At the time the Defendant was apprehended in the City of Tacoma, WA, he had two similar knives in his possession.

(c) The object of each attack was sex.

(d) The weapon of choice in each attack was the above described type of knife.

(e) The wounds and blade length of the knife used to commit the murder was [sic] consistent with the type of knife used in the assaults.

(f) In each instance the Defendant had a passing knowledge or acquaintance of the victim, and the victim had no substantial relationship with the Defendant.[1]

(g) In each instance the Defendant committed the act within his own general neighborhood.

(h) In each instance the attack was opportunistic, as opposed to a planned attack with the intent to conceal the identity of the perpetrator.

(i) In each instance the object of the attack was a demand for sex coupled with the threat to kill and prodding the victim with the knife.

(j) In each instance the victim was able to identify the Defendant.

[¶ 145] Moeller does not challenge the trial court's findings that the prior bad acts occurred. Moeller, however, attacks the trial court's ruling of admissibility of those acts arguing that the dissimilarities between the prior bad acts and the offense charged are so substantial that they overcome the State's claim of relevance. Moeller claims the end result is evidence which was impermissibly admitted to show merely that he is a bad man who has committed bad acts in the past similar to the charge he is now facing. *State v. Steele,* 510 N.W.2d 661, 668 n. 8 (S.D.1994).

[¶ 146] I agree with the majority's analysis that in this case the issue of identity is closely related to the other exceptions contained in the rule such as motive, plan or scheme, and intent. However, I will focus on the issues of identity and modus operandi, as they are dispositive.

The exception is more frequently used where two or more crimes appear to have been plotted by the same individual because they exhibit a similar unusual pattern. Distinctive "modus operandi" summarizes the rationale on which the evidence is admitted and points out that the perpetrator's identity is the purpose

---

1. For the most part, this is correct. Moeller had a passing knowledge of Becky, Moore and Warner. However, the trial court erroneously found Moeller had prior knowledge of Beshaw when he did not. The balance of the finding is correct, however. Moeller did not have a substantial relationship with any of these victims prior to his attacks upon them.

for which this kind of evidence is invariably used. 'Modus operandi' means method of working and refers to a pattern of criminal behavior that is so distinctive that separate crimes are recognized as the handiwork of the same wrongdoer. The evidence is useful to identify the accused as the perpetrator of the crime charged. The inference is from 'modus operandi' to the 'identity' of the culprit. Since the defendant acted in a distinctively similar manner on another occasion, it is more likely he (rather than someone else) did the act on the occasion of the charged crime.

*State v. Champagne*, 422 N.W.2d 840, 842–43 (S.D.1988) (citations omitted).

[¶ 147] There are common characteristics not unique to this case which are worthy of note. Moeller had an acquaintanceship or knowledge of Becky, Moore, and Warner but not Beshaw. The trial court found that Moeller committed these acts in close proximity to his residence. The attacks against Beshaw, Warner and Becky were committed in or near Sioux Falls, South Dakota. The attack against Moore was committed in Wright, Wyoming. Three of the four attacks were against females for sexual purposes. The fourth was against, Moore, a young male, also for sexual purposes.

[¶ 148] Granted, these are generic facts which by themselves could arguably apply to many violent sexual attacks. Were this all the evidence given the trial court, I would join the majority opinion that the relevance was minimal at best. When making such factual comparisons to justify admission, the facts must be distinctive, *Champagne*, 422 N.W.2d at 843; *People v. Haston*, 69 Cal.2d 233, 70 Cal.Rptr. 419, 427, 444 P.2d 91, 99 (1968); contain a marked similarity or a close parallel, *State v. Thomas*, 381 N.W.2d 232, 237 (S.D.1986); or evidence common features, *State v. Willis*, 370 N.W.2d 193, 198 (S.D.1985) (citing 2 Wigmore, *Evidence*, § 357 at 334 (Chadbourn rev 1979)). Otherwise one could argue that the attacker, in the prior bad acts and in the current charge, wore pants, tennis shoes, spoke English, wanted sex, was right-handed, or any other set of generic factors. These facts, while similar, are not so unusual and distinctive as to distinguish the modis operandi of the accused from that of many other perpetrators of the same type crime.

[¶ 149] The majority, however, fails to give sufficient emphasis to the matter of the knife and the circumstances surrounding its use relied upon by the trial court. Beshaw testified Moeller used a black-handled folding knife with a three-inch blade. Moore testified that Moeller assaulted him with a black buck knife. Warner testified that Moeller assaulted her with a folding knife, with a three and a half-inch black and a brown handle. Following questioning by law enforcement about Becky's murder, Moeller fled to the State of Washington. When captured in Tacoma nine months later, he still had in his possession, "two pocket knives or buck knives." Both knives were folding-type knives, one of which was similar to the knives used by Moeller in the prior bad acts and consistent with Becky's wound.

[¶ 150] While Dr. Randall, the forensic pathologist who performed the autopsy, was unable to testify as to the exact nature of the knife used on Becky to deliver the stab wounds, he did testify that a wound to the chest was four inches deep. The claim of the majority that the "the State's witnesses could not identify either the type of knife or the length of the blade" used in the murder of Becky takes one sentence of Dr. Randall's testimony out of context.

[¶ 151] If one has a four-inch deep knife wound which contains a hilt mark, one must logically conclude the blade that made the wound was of no more than four inches or, as Dr. Randall testified, "[i]f the blade isn't inserted to the hilt, then we don't see this type of abrasion around the edge of the wound." I know of no way the blade can be any longer than four inches and the majority does not say how it can be otherwise. Dr. Randall further testified that a blade somewhat shorter than the four-inch depth of the wound could have produced such an injury due to the compression of the chest. Clearly however, the blade did not exceed four inches in length and could not have been substan-

tially shorter than that.[2] This is much more fact-specific than the majority's assertion that "[h]aving failed to establish the type of knife or length of blade used against Becky, the State is left with the generic observation that all the offenses involved the use of a knife."

[¶ 152] The State represented to the trial court prior to trial that it would prove the knife wounds on Becky were inflicted by the same type of knife as was used in the assaults on Beshaw, Moore, Warner and were found on Moeller's person when he fled to Seattle after he was questioned about his involvement in Becky's death. The State delivered on that representation as no inconsistent facts arose at trial. All known facts on the knife wounds on Becky are consistent with the State's claim.

[¶ 153] A second factor noted by the trial court was that Moeller used this same type of knife to threaten his victims at or near the throat area. Moeller held a buck-style folding knife to Beshaw's throat and demanded sex "or I'll kill you." Moeller held the buck-style knife to Moore's throat and demanded sex "or I'll kill you." Moeller held a buck-style folding knife near Warner's throat at her upper arm and breast and said if he did not get sex, Warner and her baby were "going to get cut." The fatal wound to Becky was a knife wound to the jugular vein of her throat. See State v. Martin, 118 Idaho 334, 796 P.2d 1007, 1011 (1990) (court found assailant's placement of knife to his victims' throats when demanding sex to be a "significant similarity" between charged

crime and earlier offenses and "highly relevant to the issue of identity in the present case"). Moeller was later arrested with two such knives in his possession.

[¶ 154] These threats were not all idle talk. In 1973 apparently Moeller did not have sufficient motivation to carry through with his threats when confronted by Beshaw. However by 1979 he was fully capable of cutting Moore with the buck-style knife and did so again in 1990 in the Warner incident.[3]

[¶ 155] These attacks with the knife for sex were also unusual in that Moeller made no attempt to hide his identity, hardly a universal trait for a rapist or murderer. State v. Olson, 449 N.W.2d 251 (S.D.1989); Martin, 796 P.2d at 1011. Moeller's initial threat on Beshaw with the knife was done on a busy Sioux Falls street near Axtell Park in broad daylight after he had been loudly ejected from another car. After Moeller failed in his attempted attack on Beshaw, he had her drive him to the Speedy Car Wash where she worked. At this public point, Moeller exited Beshaw's car where she and her car were obviously well known. The attack on Moore with the knife was in a mobile home occupied by Moeller which was right next to Moore's trailer and was occupied at the time of the attack by Moore's father. Moeller had Moore contact Moore's father about a planned trip to Gillette, Wyoming, and went so far as to demand Moore's father come to Moeller's trailer with a note to give to Moeller approving the trip just prior to Moeller's attack on Moore. This provided Moore's father with the location of his son and the

---

2. Dr. Randall testified:
   This particular wound extended approximately four inches primarily front to back and towards the right.... And the abrasion around here suggests that the blade was inserted to the hilt. Because that's usually what we see causing this type of abrasion is a hilt mark. If the blade isn't inserted to the hilt, then we don't see this type of abrasion around the edge of the wound.
   Later Dr. Randall was asked:
   Q: Were you able to estimate roughly the length of the blade that would have caused the wound?
   A: No. As I mentioned, the depth of the wound was four inches but a shorter blade could have produced that due to the compression of the chest.

3. In People v. Phillips, 127 Ill.2d 499, 131 Ill.Dec. 125, 130–34, 538 N.E.2d 500, 505–09 (1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3290, 111 L.Ed.2d 798 (1990), the Illinois Supreme Court held that where the defendant is charged with a crime evidencing acts of physical violence, such as forced rape and murder, admission of a prior bad act rape did not have as a prerequisite establishing violent acts causing physical injury. Rather, the test is the overall similarities of the two crimes.

   Clearly if the prior bad acts crimes also contained similar violence, as do two of the three herein, that would be a point in favor of admissibility. In its conclusion of admissibility, the Phillips trial court, like the Moeller trial court, identified ten factors of similarity.

identity of his son's would-be attacker. Moeller was known to Warner when he wandered into her apartment for a visit. His opening words were, "[h]ello, do you know me?" Warner indicated she did. He left after a brief visit only to return a short time later to assault her with intent to forcibly molest her knowing she could readily identify him. He also parked his car in Warner's driveway prior to the attack thus allowing Warner to obtain his license plate number when he left after the attack.

[¶ 156] While the rape and murder of Becky probably occurred in rural Lincoln county, that misses the point. Likewise, the claim that Becky was murdered to hide the identity of her attacker is also off the mark. Moeller had previously overtaken Becky at the intersection of Main and Russell, two of the busiest streets in Sioux Falls at the height of the 5 o'clock rush hour only minutes before the attack upon her. Just prior to that he had been spotted by a clerk next to Becky in a busy store in which he was a well-known customer. Moeller was known to the clerk as the store stocked an unusual brand of cigarettes for Moeller at his request. Moeller's failure to hide his identity prior to his abduction and attack on Becky is even more bizarre when one considers he did substantial prison time for all three prior bad acts either upon a guilty plea (Moore), conviction (Warner), or pursuant to a plea bargain concerning other crimes (Beshaw). Rather than attempt to hide his identity, Moeller seems to display it.

[¶ 157] In keeping with his lack of desire to hide his identity in all four attacks, initial contact with his intended victims occurred within fifteen blocks or less of his victims' homes.

[¶ 158] The trial court further found it significant that Moeller did not have a "substantial" relationship with Becky, Moore, Beshaw and Warner prior to the attacks. Most rape victims know their attacker on more than a passing basis.[4]

[¶ 159] While the facts surrounding the knife are significant in themselves, each fact is not to be examined in isolation when applying the abuse of discretion standard of review.

It is apparent that the indicated inference does not arise ... from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly *or in combination,* logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.

*Haston,* 70 Cal.Rptr. at 427–28, 444 P.2d at 99–100 (cited with approval by McCormick's Handbook of the Law of Evidence § 190, n. 37 (2d ed 1972))(emphasis added).

[¶ 160] This also disposes of Moeller's claim that lack of similarity of victims (in that Becky was a young girl, Beshaw and Warner were adult women, and Moore, a young boy) automatically precludes admission. The comparison of victims is not dispositive, by itself, of the admissibility issue. *State v. Houghton,* 272 N.W.2d 788 (S.D.1978), reinforces the rule of law that the modus operandi issue is determined based on all factors, rather than pointing to one factor in iso-

---

4. Recent statistics indicate rape victims know their assailants well in eighty-four percent of the cases. Marcia G. Pfeiffer, *Date Rape: The Reality,* 17 SULRev 283, 284 (1990). One commentator noted this figure demonstrates "acquaintance rape is more common than 'left-handedness,' heart attacks, and alcoholism." Linda Robayo, *The Glen Ridge Trial: New Jersey's Cue to Amend its Rape Shield Statute,* 19 Seton Hall LegisJ 272 at n. 87 (1994).

lation. *Houghton* is particularly instructive as it was decided by the same Court who had only five months earlier adopted SDCL 19–12–5 as a court rule.

[¶ 161] In *Houghton*, the defendant was charged with raping an adult woman. The State sought to introduce evidence of two prior rapes of women under SDCL 19–12–5. The opinion identifies no common characteristics of the three purported victims but goes into great detail on the defendant's unusual methodology in carrying out his alleged attacks. Although the Court found identity was not in issue, it stated the rapes were "committed in a similar, unique manner sufficient enough to be like a 'signature.'" *Id.* at 792.[5]

[¶ 162] Thus, one looks to the totality of the circumstances to determine if similar circumstances exist to justify admissibility and not to a checklist, brightline rule, or point counting. The sex and age of the victims are merely factors which weigh for or against admissibility along with all other relevant facts. *See State v. Dokken*, 385 N.W.2d 493, 497–98 (S.D.1986) (adopting the same analysis under a "similar circumstances" criteria concerning the crime of manslaughter); *see also State v. Fender*, 358 N.W.2d 248, 253 (S.D.1984)(defendant's prior violent acts committed on his wife held admissible in defen-

dant's conviction for aggravated assault on a policeman).

[¶ 163] Is the use of the buck-style folding knife or similarly-bladed knife, under these circumstances, sufficient to constitute a marked similarity or evidence common features, when combined with the other relevant facts? Moeller claims he is entitled to a "dispassionate, factual comparison between the prior acts and the allegations against Defendant." That should be carried one step further with a dispassionate, factual comparison between the prior and present acts of this case and acts of a similar nature in other cases in this jurisdiction.[6] For if what he claims is true, that this type of knife and the circumstances surrounding its use are common, surely other such common cases must have arisen since 1978. However, Moeller fails to cite us to a single South Dakota case which is even remotely similar as to the facts. For that matter, he also fails to cite to any factually similar cases in any jurisdiction which support his argument.[7]

[¶ 164] The following South Dakota murder and manslaughter cases involved the use of a knife, however, none revealed the use of a buck-style knife or folding knife: *State v. Blue Thunder*, 466 N.W.2d 613 (S.D.1991)(butcher knife); *State v. Bennis*, 457 N.W.2d 843 (S.D.1990)(butcher knife);

---

5.  The *Houghton* Court upheld the trial court's refusal to admit the prior bad acts on the basis of undue prejudice to the defendant combined with a minimal probative value. In *Houghton*, the defendant convinced both the trial court and this Court that identity was not an issue, thus negating any use of the prior bad acts to prove his identity. The issue became one of consent to sex by the purported victim. Herein, Moeller has admitted to the trial court that identity of Becky's killer is a major issue thus putting into question the matter of modus operandi. Second, in *Houghton*, the defendant vigorously contested he committed the purported prior bad acts. Moeller, however, did not contest his commission of the prior acts. Finally, in *Houghton*, we applied the proper abuse of discretion standard in affirming the trial court's finding of denial of admissibility. Here, we analyze the opposite result—the trial court's finding of admissibility under the same abuse of discretion standard.

6.  This type of caselaw analysis is a mandatory obligation of this Court at the sentencing phase of a death penalty case placed upon us by the

Legislature pursuant to the enactment of SDCL 23A–27A–12(3). This statute requires, in part, that this Court engage in a comparison of death penalty cases with "similar cases, considering both the crime and the defendant." *See generally State v. Rhines*, 1996 SD 55, ¶ 85, 548 N.W.2d 415.

7.  Moeller relies on the following cases to support his argument. In *People v. Alcala*, 36 Cal.3d 604, 205 Cal.Rptr. 775, 685 P.2d 1126 (1984), *cert. denied*, —— U.S. ——, 114 S.Ct. 215, 126 L.Ed.2d 171 (1993), no weapon was used by the defendant to commit his prior sexual acts. In *White v. Commonwealth*, 9 Va.App. 366, 388 S.E.2d 645 (1990), *overruled on other grounds by Lavinder v. Commonwealth*, 12 Va.App. 1003, 407 S.E.2d 910 (1991), a knife of unknown description was used to commit the charged rape and a prior rape. In *Foster v. Commonwealth*, 5 Va.App. 316, 362 S.E.2d 745 (1987), a "small handgun" was used to commit the charged rape and a prior sexual assault. In *State v. Hansen*, 187 Mont. 91, 608 P.2d 1083 (1980), no weapon was used in a series of sexual assaults after the victims were picked up in bars.

State v. Jenner, 451 N.W.2d 710 (S.D.1990), cert. denied, — U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993), (Chicago cutlery knife); State v. Bittner, 359 N.W.2d 121 (S.D. 1984)(knife of unknown description); State v. Adams 418 N.W.2d 618 (S.D.1988), cert. denied, — U.S. ——, 115 S.Ct. 754, 130 L.Ed.2d 653 (1995), and State v. Boykin, 432 N.W.2d 60 (S.D.1988)(fillet knife); State v. Gregg, 405 N.W.2d 49 (S.D.1987)(knife from a sheath of unknown description); State v. Ashker, 412 N.W.2d 97 (S.D.1987) and State v. Novaock, 414 N.W.2d 299 (S.D.1987)(knife of unknown description).

[¶ 165] As this is a case involving a rape-murder, it is interesting to note that none of the other reported rape-murder cases in this jurisdiction were committed with any type of knife: State v. Davi, 504 N.W.2d 844 (S.D. 1993)(death by strangulation); State v. Rough Surface, 440 N.W.2d 746 (S.D.1989)(decedent beaten to death); State v. White, 528 N.W.2d 237 (S.D.1995)(death by rupture of a blood vessel in the victim's brain).

[¶ 166] Only one non-murder case could be located where a rape was committed with a knife: State v. St. Cloud 465 N.W.2d 177 (S.D.1991)(knife of unknown description).

[¶ 167] The attacks against Beshaw, Moore, Warner, and Becky were also aggravated assaults. This jurisdiction's case law concerning aggravated assaults shows the following involved a knife: State v. Washington, 537 N.W.2d 380 (S.D.1995)(carpet knife);

State v. Chase in Winter, 534 N.W.2d 350 (S.D.1995)(knife of unknown description); Two Eagle v. Leapley, 522 N.W.2d 765 (S.D. 1994) and State v. Gallegos 316 N.W.2d 634 (S.D.1982)(defendant pulled a knife of unknown description upon policemen). The only two aggravated assault cases which are remotely similar concerning weapons are State v. Ganrude, 499 N.W.2d 608 (S.D.1993) and State v. Rios, 499 N.W.2d 906 (S.D.1993). However the balance of the facts are strikingly different from the case now before us. In Ganrude, the defendant pulled a switchblade of unknown size on an adult male at the State Fair. The victim was not physically injured. In Rios, the defendant committed the aggravated assault with a lock-blade knife of unknown size. Rios involved an altercation between two young males in a Rapid City mall. Apparently the victim was not injured with the knife. Neither case involved sexual assault. Further, both Ganrude and Rios were decided more than a year after the trial court made its ruling in this case.[8]

[¶ 168] Moeller's claim that the evidence of prior bad acts is generic or common fails on another note when the above South Dakota case law is reviewed. In all of the above cases dealing with weapons, the so-called common issue of prior bad acts was never even raised with the exception of Davi, 504 N.W.2d 844. In Davi, we upheld the admission of the defendant's prior threats and harassing phone calls against the decedent.[9]

8. This is a listing of all relevant South Dakota cases that could be located decided after the adoption of SDCL 19–12–5 in 1978. The trial court made its ruling on admissibility of the prior bad acts on June 1, 1992. It clearly could not anticipate the future as to the facts and our decisions in cases that arose thereafter. Nevertheless, the subsequent cases are listed for the sake of completeness and to demonstrate that no case law has arisen since the trial court's decision which would support Moeller's argument that the facts of this case and the prior bad acts are generic.

9. Moeller and the majority argue that the use of the knife and the circumstances surrounding its use are common. Black's Law Dictionary 275 (6th ed.1990) defines "common" in part as:

Belonging or pertaining to many or to the majority. Generally prevalent, of frequent or ordinary occurrence or appearance; familiar

by reason of frequency. Also, usual, customary, and habitual .... (citations omitted).

Either fact situations are common or uncommon. They cannot be both. Cited herein is every rape, murder and assault case reported in this jurisdiction by written opinion or pursuant to SDCL 23A–27A–13 since 1978 when SDCL 19–12–5 was adopted. These cases are cited to show that if the events surrounding the case now before us are "common," by definition there should be other "common" cases reported. According to the above definition such similar cases should be "generally prevalent or frequent or ordinary ... usual, customary and habitual." Instead there are none, not one, save Donald Moeller. Given this, I am not surprised that the majority's conclusion, "[f]ocusing on only reported cases is an unrealistic and unscientific means of deciding whether the use of a folding or buck-style knife is a unique characteristic" is made without citing supporting authority.

[¶ 169] It is instructive to note that in *Dokken*, 385 N.W.2d 493, we held it was not an abuse of discretion to admit a prior bad act committed by the defendant which occurred previous to the charged homicide where both the prior bad act and the homicide involved the use by the defendant of the *same weapon*, a gun. Therein we held:

> [t]he term "modus operandi" is included with the "plan" exception in SDCL 19–12–5. Thus, we stated that the plan exception requires that the former acts should indicate, by common features, a plan or design which tends to show that it was carried out by doing the act charged.

*Id.* at 497 (citing *Willis*, 370 N.W.2d at 198).[10]

[¶ 170] The trial court relied on *State v. Martin*, 118 Idaho 334, 796 P.2d 1007 (1990), in its determination of admissibility as *Martin* closely parallels the case now before us. In *Martin*, two prior bad acts concerning sexual assaults were admitted as relevant to the modus operandi with the current charge also being a sexual assault. Affirming the trial court under an abuse of discretion standard of review, the Idaho Supreme Court noted that in all three cases, the perpetrator used "a kitchen knife to perpetrate the crime." *Id.* at 1011. However, this was not the same kitchen knife, but similar kitchen knives obtained from the three victims' kitchens.[11] Likewise, in *Commonwealth v. Keizer*, 377 Mass. 264, 385 N.E.2d 1001 (1979), the Massachusetts Supreme Judicial Court stated the question of prior bad acts admissibility concerning weapons required that they be similar "not just in the generic sense, but in terms of specific characteristics." *Id.* at 1004. There the court admitted a prior bad act where both crimes involved "what appeared to be a square-barrelled pistol and a sawed-off shotgun concealed by a paper bag." *Id. See State v. Breazeale*, 238 Kan. 714, 714 P.2d 1356, 1358 (1986), *cert. denied*, 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 102 (1986), (same result involving the use by the defendant of "a small handgun"); *State v. Thomas*, 110 Ariz. 106, 515 P.2d 851, 853 (1973)(wherein the court relied in part on the defendant's use of "a knife" and that "the geographical location of the crimes was either in the defendant's neighborhood or in areas where he previously resided"); *State v. Braman*, 191 Conn. 670, 469 A.2d 760, 764 (1983) ("a shotgun with a cut-down configuration and a small automatic pistol"); *Phillips*, 131 Ill. Dec. at 134, 538 N.E.2d at 509; and *People v. Tate*, 87 Ill.2d 134, 57 Ill.Dec. 572, 577, 429 N.E.2d 470, 475 (1981) (deeming the use of

10. This Court has sought to compile information on all potential death penalty cases of first degree murder for possible proportionality review. SDCL 23A–27A–13. Many of these cases have already been cited herein. However, in numerous murder cases the defendant entered a plea of guilty and there was no appeal to this Court or the cases were not cited above because of factual differences. It appears that the following methods of killing were used in those cases not reported above: handgun, ten convictions; rifle or shotgun, four convictions; gun of unknown description, four convictions; strangulation or smothering, seven convictions; beating, three convictions; knife of unknown description, three convictions, beating and knife of unknown description, one conviction; auto jack, one conviction; and no indication, three convictions. There is not a single case involving a homicide with a buck-style folding knife with a three- to four-inch blade.

11. As noted above, the facts and analysis in *Martin* are important because it is the framework upon which the trial court herein based its analysis and ruling of admissibility. The majority lists fourteen criteria in *Martin* which leads it to conclude, "[t]he numerous and distinctive similarities detailed in *Martin* are noticeably absent in the case." This is curious in light of the fact that factor one in *Martin* is "all were rape-type cases," factor three "all victims knew Martin," factor five "all victims were surprised by their assailant," factor eight, "the assailant always used a kitchen knife to perpetrate the crime," factor nine, "the knife always came from the victim's kitchen" (the same source), factor eleven, "apparently, the assailant always left without taking objects from the residence," factor twelve, "the assailant always placed the knife by the victim's throat to perpetrate the crime," factor thirteen, "the assailant always threatened to kill the victim if she did not comply with his desires" and factor fourteen, "the victims were all injured by the knife." Compare with ten factors recognized by the trial court listed at p. 496 of this dissent.

The majority concludes that *Martin* "identified a long list of similarities between the other acts and the charged offense." That is fourteen versus the ten identified by the trial court herein. I know of no legal doctrine that decides such issues by rote number. Rather it is the "totality of circumstances" that controls. (See pp. 498–499 of this dissent).

similar weapons a "distinctive link" between past and present offenses).

[¶ 171] The majority argues that it cannot be ascertained for certain that Becky was killed with exactly the same type of knife that was used in the prior bad acts. Although this argument is correct to a point, it does not apply the appropriate standard. The proper standard under *Haston, Martin, Breazeale, Thomas,* 515 P.2d 851, *Braman, Keizer, Phillips,* and *Tate* as applied to the facts of this case, establish that the weapon used in Becky's death is consistent with the weapons used in the prior bad acts, comparing all known criteria. If major inconsistencies arise as to the type of weapon, then clearly the similarity as to the weapon used has not been established. If all points are similar, as they are here, then it is up to the sound discretion of the trial court to determine if they contain a marked similarity or establish common features. *Thomas,* 381 N.W.2d at 237; *Willis,* 370 N.W.2d at 199.

[¶ 172] Moeller's claim that the facts of this case, including the distinctive knife and blade size, are generic has no basis in the record and certainly does not have any such merit when compared to other cases decided by this Court. In short, no reported case in this jurisdiction, the facts of which include a buck or folding-blade knife or, for that matter, any type of knife blade of that size used to commit a sexual assault under circumstances similar to the case now before us, involve anyone other than one person—Donald Moeller. *See State v. Moeller,* 511 N.W.2d 803 (S.D.1994). In that case Moeller was convicted of two counts of aggravated assault for the attack on Warner.

[¶ 173] While it is necessary that the prior bad acts evidence bear a substantial degree of similarity to the present crime in order to show a modus operandi, *see Werner,* 482 N.W.2d at 289–90 and *State v. Christopherson,* 482 N.W.2d 298, 301–02 (S.D.1992), the circumstances of the prior offenses need not be identical to those of the crime charged. *Martin,* 796 P.2d at 1010 and *Breazeale,* 714 P.2d at 1362; *cf. Werner,* 482 N.W.2d at 289–90. Herein Moeller's prior bad acts demonstrate his "handiwork" *(Champagne),* contain a "marked similarity" or "close paral-

lel" *(Thomas),* and establish "common features" *(Willis).*

[¶ 174] Fundamentally there is nothing novel about this issue. It is simply a circumstantial evidence question, the type of evidence we routinely instruct juries about in this state. However, there is one major difference. Unlike the jury, we do not find the facts beyond a reasonable doubt. Rather, we focus on the issue from the standard: was the trial court clearly erroneous in its findings that the prior bad acts were the defendant's handiwork or contained common features? When applying the above facts and authority, I believe a "judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion" and thus the trial court did not abuse its discretion when it found the evidence of sufficient probative value concerning the modus operandi. *Dakota Cheese,* 525 N.W.2d at 715.

[¶ 175] *II. Prejudice*

[¶ 176] If the relevancy question has been determined in favor of the State, the trial court must then proceed to perform a balancing test to determine whether the prejudicial effect of the evidence substantially outweighs its probative value. SDCL 19–12–3; *Werner,* 482 N.W.2d at 289. As noted by the majority, " 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Iron Shell,* 336 N.W.2d 372, 375 (S.D.1983).

[¶ 177] Moeller advances two arguments in regards to this question. He argues that he was unduly prejudiced due to the sensational nature of the case when combined with the other bad acts and that at least two of the bad acts were too remote in time to be admissible.

[¶ 178] Herein the trial court determined there was substantial need for the prior bad acts evidence by the State because this was a circumstantial evidence case and Moeller had given notice of an alibi defense. The trial court stated in its Memorandum Opinion,

504

"the defendant, in his brief, admits that because the State's case is based on purely circumstantial evidence, 'identity of the perpetrator is the central issue that will be before the jury.'" The court found that there was no other evidence of equal probative value.

[¶ 179] Recently in *White*, 538 N.W.2d at 243, we adopted the same premise. We held that "the court determines whether the danger of unfair prejudice substantially outweighs the probative value of the evidence 'in view of the availability of other means of proof' and the other factors under SDCL 19-12-3 (Rule 403)." *Id.* citing *State v. Basker*, 468 N.W.2d 413 (S.D.1991). In *White*, we affirmed the trial court's admission of the defendant's prior bad acts because "'the probative value is high. The purported victim is dead. There are no other witnesses concerning the issue of the circumstances under which the [D]efendant was admitted to the decedent's home.'" *Id.* (quoting the trial court's balancing of the probative value against the prejudicial effect).

[¶ 180] Herein the same rationale should apply. Becky is dead. There are no eye witnesses as to the identity of her abductor, rapist and killer. There is no other evidence available to replace the prior bad acts in assisting to identify the perpetrator. Such a finding weighs in favor of admissibility. *Id; Werner*, 482 N.W.2d at 290. *See also U.S. v. Ingraham*, 832 F.2d 229, 237 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) ("Because the unknown in the case was whether X = Ingraham, the probative worth of this [prior bad acts] evidence far outstripped any *unfairly* prejudicial effect.") (emphasis in original).

[¶ 181] Given the finding of need for this information, the trial court proceeded to do everything it could to avoid any unfair prejudice. The trial court determined it would

instruct the jury as to the limited nature of the other acts evidence prior to the individual testimony of Beshaw, Moore and Warner as well as at the close of the trial. *See State v. Means*, 363 N.W.2d 565, 569 (S.D.1985). Juries are presumed to follow the instructions of the trial court. *Id.* (citing *State v. Reddington*, 80 S.D. 390, 125 N.W.2d 58 (1963)). The trial court also refused to admit into evidence at trial an alleged prior assault by Moeller on his wife with a generic knife of unknown origin because of "insufficient evidence." Further to avoid sensationalism, the trial court refused to allow admission of evidence that, when arrested, Moeller had in his possession pornographic magazines and a "registered pervert" emblem.[12]

[¶ 182] I must also respectfully part company with the majority's conclusion that "[t]he other acts testimony was a shocking and emotionally gripping contrast to State's sterile circumstantial case." The "State's sterile circumstantial case" was the brutal multiple rape and murder by repeated stabbings of a totally innocent young girl. By contrast, Beshaw was not injured at all, and Moore and Warner appear to have sustained no life-threatening or serious injuries. While the prior bad acts were hardly pleasant for the victims, claiming them to be "shocking and emotionally gripping" when compared to Becky's murder is not supportable.

[¶ 183] In other cases, unfair prejudice has been claimed by the defendant on the basis that it requires the defendant to not only defend himself against the crime with which he is charged, but allegations of other bad act crimes which may or may not be true. *Houghton*, 272 N.W.2d 788. Herein no such unfair prejudice arises as Moeller does not contest the existence of the prior bad acts.

[¶ 184] Regarding the issue of remoteness, it is clear the Beshaw incident occurred in 1973 and the Moore incident occurred in

12. The majority concludes:
   Unable to define concrete similarities among the other acts and charged offenses, the State failed to give the jury any clear guidance concerning the relevance of the other acts to legitimate issues in the case. Without more compelling direction from the State, the jury's verdict almost certainly rested on the forbidden inference that because Moeller was involved in other sexual assaults, he likely committed the offenses against Becky.
   I respectfully submit that the majority errs when it places this obligation upon the prosecution rather than the trial court and fails to take into account the effect of the trial court's instructions to the jury on the prior bad acts.

1979. Thus, seventeen and eleven years have passed between these acts and Becky's rape and murder. In *Werner*, this Court held:

> Werner claims the other acts testimony was too remote from the acts charged. When standing on its own, the testimony from these women may appear remote in time. In fact, the other acts evidence spanned several years. However, in determining probative value, remoteness must be considered with other factors, such as reliability and necessity. *State v. Titus*, 426 N.W.2d 578 (S.D.1988).
>
> Furthermore, '[t]he trial court must consider the nature of the offenses, the similarity of occasions and locations as well as the time elapsed between incidents.' *Id.* at 580. '[W]hether prior acts are too remote must realistically depend on their nature.' *State v. Wedemann*, 339 N.W.2d 112 (S.D. 1983). Moreover, 'each case depends upon its own particular facts as to a limitation, regarding vintage, on the remoteness. Admission of prior acts must realistically depend upon their nature.' *Titus*, 426 N.W.2d at 582 (Henderson, J. concurring specially).

*Werner*, 482 N.W.2d at 289.[13]

[¶ 185] The trial court followed *Werner* and concluded on the remoteness issue:

> Attached to the State's brief is a copy of the rap sheet for the defendant. It is clear that the defendant has been confined in prison the greater portion of his adult life. It further appears that the criminal activity of defendant abated only during periods of incarceration. Defendant plea-bargained a sexual assault charge to a theft plea in 1973 and was incarcerated more or less continuously from 1973 to 1979. Defendant was again in the penitentiary from 1979 to 1988. It would seem that defendant's incarceration is really the only obstacle to a continuous life of crime. Further, this would explain the lack of other

similar criminal activity of more recent vintage.

> It is the opinion of this court that the State should not be deprived of the use of such evidence simply because defendant was denied his freedom by reason of his own criminal activity which deprived him of the opportunity to commit such crimes. When defendant's period of incarceration is taken into account, the period of opportunity between the prior crimes and the principal offense is approximately two years.

*See Breazeale*, 714 P.2d at 1356 (ten years' time not found to be remote in light of fact defendant spent intervening years in prison), and *Martin*, 796 P.2d at 1014 (period of ten and twelve years not found to be remote where defendant was incarcerated nearly the entire period).

[¶ 186] Based on the extensive pre-trial hearings and briefs on the prior bad acts issue, the trial court clearly had sufficient information to properly perform the balancing test as required by SDCL 19–12–5. *State v. Chapin*, 460 N.W.2d 420, 422 (S.D. 1990). The trial court's determination whether the probative value of the bad acts evidence is substantially outweighed by its prejudicial effect is an issue left to the sound discretion of the trial court, and we will not overturn it on appeal absent a "clear abuse of discretion." *Werner*, 482 N.W.2d at 290–91, *Champagne*, 422 N.W.2d at 842. I conclude that based on the record, no such abuse of discretion occurred as "a judicial mind, in view of the law and circumstances, could reasonably have reached that conclusion" concerning the prejudice issue. *Dakota Cheese*, 525 N.W.2d at 715.

[¶ 187] In conclusion, I respectfully dissent on Issue One. I am unable to find any evidence in the record or relevant case law from this jurisdiction to support Moeller's attempt to show that this type of knife and the totality of the circumstances of its use are not unusual in the commission of rape-murders in this state. Thus, the theory is reduced to

---

**13.** This Court has previously affirmed the admission of prior bad acts with a span of 17 years and more. In *Werner*, 19 years ran between the first act of sexual misconduct and the time of trial. In *Christopherson*, 482 N.W.2d 298, 17 years elapsed between the first molestation and trial. In *State v. Ondricek*, 535 N.W.2d 872 (S.D.1995), 25 years expired between the first sexual misdeeds and trial.

arguably perusing the aisles of local stores to conclude such knives are generic or commonly offered for sale to the public. The so-called fact that these knives are commonly offered for sale proves nothing by itself. So are many other articles of merchandise, some harmless and some possessing potential for harm. For such an argument to have merit, however, one must make the leap from items commonly offered for sale to items used to commit forced rapes, aggravated assaults or murders. Herein Moeller and the majority opinion are unable to cite any facts or cases from this jurisdiction to support this thesis.

[¶ 188] I end this issue as I began it. Our standard of review is abuse of discretion. Did the trial court lack "a judicial mind" in view of the law and the facts of this case in arriving at this decision of admissibility? Another jurist once defined abuse of discretion as shooting at a target. You did not need to hit the bulls-eye but did need to hit the target. I would submit herein the trial court hit the target.

### [¶ 189] ISSUES TWO, THREE, FIVE, SIX, AND SEVEN

[¶ 190] I concur.

### [¶ 191] ISSUE FOUR

DOES A TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AS TO THE DEFINITION OF "REASONABLE DOUBT" AT THE SENTENCING HEARING REQUIRE REVERSAL AND VACATION OF THE JURY'S VERDICT OF DEATH?

[¶ 192] As the majority would reverse on Issue One, it did not reach this issue. With my view that Issue One should be affirmed, I am compelled to address this issue on the merits.

[¶ 193] In South Dakota a person cannot be sentenced to death unless the jury determines the existence of an aggravating factor beyond a reasonable doubt. SDCL 23A-27A-5. Herein the jury was correctly instructed at the guilt phase of the trial as to the definition of reasonable doubt. However, due to inadvertence at the sentencing phase, no similar instruction was given.

[¶ 194] At the outset, the State argues that this issue was waived since Moeller failed to offer a proposed instruction on the subject. *State v. Holloway,* 482 N.W.2d 306, 309 (S.D. 1992). The State then proceeds to argue that the "plain error" doctrine can not apply since this error "is neither obvious nor substantial." *Holloway,* 482 N.W.2d at 309.

[¶ 195] I would apply the plain error rule as I disagree with the State on both points. SDCL· 23A-27A-3 specifically requires the trial court to properly instruct the jury at the penalty phase of a proceeding. "Upon the conclusion of the evidence and arguments of counsel, the judge *shall* give the jury appropriate instructions ...." (emphasis added). Therefore the State's argument that any error is corrected by the fact the jury was properly instructed at the guilt phase conflicts with the explicit terms of SDCL 23A-27A-3.

[¶ 196] Further, there is nothing in the record to reflect that the non-law-trained jury, in this most pressure-packed of situations, could and did, accurately recall the reasonable doubt instruction it had previously been given during the guilt phase of the trial. It did not have that instruction in the jury room with it at the penalty hearing. A review of the penalty phase jury instructions shows no reference to the guilt phase instructions, nor do the penalty phase instructions direct the jury to recall or refer back to the guilt phase instructions, based on its memory. How many members of the bench and bar can accurately recite the reasonable doubt instruction from memory? This clearly was an error of an obvious and substantial nature as the other penalty phase instructions made at least ten references to "reasonable doubt" in those instructions without defining it. Given the fact that the above statutes specifically required the trial court to instruct on the definition of reasonable doubt and the fact it failed to do so, I would hold this is plain error and therefore Moeller did not waive the issue for review on appeal to this Court.

[¶ 197] The State then proceeds to argue that if this is a technical violation of a statute, it is not a structural defect affecting the

fairness of the trial or, in other words, it is harmless error.

[¶ 198] When the jury is the final sentencer, it is essential that the jury be properly instructed "regarding all facets of the sentencing process." *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court held that an improper definition of reasonable doubt in a jury instruction is a structural constitutional error in the trial which cannot be harmless. The reason is obvious:

> But the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings. A reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty.'

508 U.S. at 281, 113 S.Ct. at 2082, 124 L.Ed.2d at 190. (emphasis original).

[¶ 199] The State relies upon *State v. Holmes,* 464 N.W.2d 612, 613 (S.D.1990), wherein we held that it was harmless error when the trial court failed to instruct on the "presumption of innocence." We arrived at this conclusion based on our view that the record established the defendant's guilt on an overwhelming basis. The State cannot claim such is the state of the record here. It argued, and the trial court accepted the premise, as do I, that the prior bad acts were essential to be admitted based on the circumstantial nature of the facts of this case and lack of direct proof of identity of Moeller as the perpetrator of the crime.

[¶ 200] To me, allowing the jury to speculate as to the standards for reasonable doubt is as major an error as a jury that received guidance from the court, albeit, not accurate guidance. In the end, the result is the same—a conviction not shown to be based upon the Constitution and the correct rule of law. This was a prejudicial error of both statutory and Constitutional magnitude.

*CONCLUSION*

[¶ 201] I would affirm the conviction on the murder charge. I would reverse and remand on the penalty verdict of death to allow the State to impanel a new jury for a retrial of the penalty phase. If the State elects not to do so, the conviction for murder in the first degree under SDCL 22-6-1 would be life imprisonment in the state penitentiary with no possibility for parole.